No. 126.—CANN COSTLY, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] The non-residence of a Juror being but a cause of challenge, *proper defectum* can, and consequently *must* be made by the prisoner, before the Juror is sworn; and it makes no difference whether such want of qualification was known or unknown at the time the Juror was sworn.

[2.] On a motion for a new trial, in a criminal case, because of the previously expressed opinion of one of the Jurors who rendered the verdict, the Circuit Judge, *quoad* this question, occupies the place of a trior; and this Court will not undertake to control his judgment, as to the credibility of the proof.

[3.] The words "trial by Jury as heretofore used in this State," mean nothing more than trial by *Jury* in its essential elements as contradistinguished from other *modes* of trial.

Murder, in Fulton Superior Court. Tried before Judge BULL, April Term, 1855.

This bill of indictment was found against the plaintiff in error, Asa Humphries, John Humphries, William Robertson and Dink Carlton, for the killing of      Kent, at the October Term, 1854, of Fulton Superior Court.

At the April Term, 1855, Cann Costly, the plaintiff in error, was placed upon his trial.

DR. CHAPMAN POWELL, sworn on the part of the State, testified: "That he is a physician; attended the deceased last July; found cut on the left side, with a knife wound about one and a half inches long; the print of the heel of a shoe or boot on the left breast, and also on the right breast; a considerable bruising on the left side of the head; one on his left arm; does not know the depth of the wound; it looked like it was done with a knife; the wound was in three or four inches of the spine; the bruise on the left breast showed the shape of the heel with the nails or tacks plainly; the bruise was of a dark livid color; the breast was bruised nearly all over; the first day he saw the deceased, was on the 5th of July, and saw him every day until he died, on the

30th or 31st of that month; saw him after he was dead; is of opinion that the death was produced from the cut in the side, and the bruise he had received from the stamping; that it was his opinion, at first, that the stab might have been cured if it had not been for the other injuries; the deceased died in this county and this town, at the house of his father.

Cross-examination: Deceased complained of the wound in his side and the bruise on the head and breast, all being very painful; complained of his side after the wound healed; had very severe dysentery four or five days before he died, and fever all the time; his discharges were rather watery, mixed with bloody mucus.

Re-examined: Thinks that the dysentery was produced by inflammation from the cut and bruises; a dysentery prevailed about that time, of which a number of persons died, before and after the deceased.

Dr. John F. Westmoreland sworn, testified as follows: He attended a *post mortem* examination of the body of a young Kent, at his father's, last summer; on opening the chest it was found filled with a sort of sanguinous fluid, which might be called a bloody puss; the left lung was perfectly compressed; seemed to have had no air in it for some time; the pleura covering the side of the chest and covering the lung, seemed to have been inflamed; there was the appearance of a wound having been made in the left side, which had cicatrized; judging from all he could see and learn, and from apparent circumstances, is of opinion that the wound in the side was the cause of this death; the wound was made with a sharp instrument; believes that the appearances in the chest and lungs were caused by the wound in the side; thinks the chest was entered by the instrument that produced the wound; thinks there was a fusion of blood or hemorrhage into the chest, that compressed the lung; his attention was also called to a slight depression on the upper part of the left breast, having a slight discoloration; deceased had not been buried when the examination was made.

Cross-examination not taken down.

ELIJAH S. BIRD, sworn, said: "Was acquainted with Kent; saw him about the fourth of July last, on the race track, at the grocery of Asa Humphries, in this county; saw a difficulty between deceased and prisoner; first he saw of the difficulty, deceased and prisoner were quarreling; prisoner had accused Kent of rocking his house some time before that; Kent told him he did not do it and could prove himself clear of it; prisoner told him he did do it, and from that the lie was passed; prisoner then threw a rock at deceased, but did not hit him with the first rock; then a second, and hit him in the left side; they then ran together, as if going to hurt each other; prisoner had a knife open in his hand, blade turned up on the under side of his arm; did not see him when he made the lick with the knife; saw them after they were separated; Kile caught hold of deceased by the skirt of his coat and jerked him apart; deceased fell some ten feet from where they were separated; they got together again, when deceased fell from the jerking of Kile. Asa Humphries ran out to where he was; by the time Humphries got there, there were so many around witness could not see what Humphries did; about the time deceased got up, Carlton hit him on the side of the face with a chunk or piece of wood; John Humphries threw a piece and hit Carlton on the head; Costly got there by that time and Kent started to run; Wm. Roberson handed prisoner a stick and told him to hit him with it and give him hell; prisoner then threw the stick at deceased and hit him on the back of the head; while Kent was running threw at him twice; hit him about the time deceased got to the road; did not quite knock him down. Deceased staggered and fell after he got across the road; saw deceased half an hour afterwards; saw a cut in his left side, one inch or a half inch long; saw a place cut in his shirt on the left side, some two inches long; deceased was lying on the bank of the rail road some half hour afterwards; witness helped to carry him home; his shirt was bloody; did not notice the blood when deceased first fell; saw it while he was running off;

fell nearly in front of the grocery; saw the wound after deceased fell the second time; after Kent fell the second time prisoner threw the stick at him again; prisoner pursued the deceased about twenty yards; Kent, after he got up, was running down to the woods, when prisoner was pursuing him. The difficulty first commenced rather back of the grocery, about ten feet from the shed; witness and Mr. Churchill were standing close to them; Asa Humphries was talking to prisoner and told him to hit him; he was standing with his head out of the window, some 15 feet off; no person was nearer than eight or ten feet of them; prisoner's left hand was towards witness when they ran together; it was some half a minute that they were separated before they got together again; did not see deceased do any thing to prisoner after he first fell, after deceased ran and prisoner hit him; witness does not know whether he hit him with the stick in his hand or threw it at him; prisoner was right behind him.

Cross examined: Kent was on the top of prisoner when Kile pulled him off; prisoner was down.

Re-examined: This took place on the 4th July last.

WILLIAM WELMETH, sworn, said: Was present when a difficulty took place between prisoner and deceased on the 4th July last year, at the race track in this county; it was near a grocery; Asa Humphries was in the grocery that day; first he saw he heard a kind of a riot and looked out of the window and saw it was a couple of boys; Mr. Humphries put his head out of the window and hallooed, whip him Cann, whip him; saw prisoner throw at deceased with a rock or brick bat; did not hit him; witness stepped to the door, and as he got to the door he threw again and hit him on the arm; they ran together and clinched; witness saw him, Costly, hit him, deceased, on the left side, as witness then thought, with his fist; then Kile caught Kent and threw him clear away from prisoner; they were in the act of falling, Kent rather on top, when Kile threw him off; they then crowded around and witness saw Humphries run out by witness and witness stood in

the door; Kent was still rather on his all-fours when Humphries got to him; he or some one else kicked him and he fell; witness ran out and when he got to them Humphries was stamping deceased; witness caught hold of Humphries and pulled him from deceased; deceased then rose and broke to run and prisoner took after him with a stick [in his hand; threw it at him as he was running off; struck him on the back, up and down the back, the end of his stick striking the back of his head; knocked him rather on his all-fours; deceased rose running again; threw the stick at him again; does not know whether he hit him or not; some one called to prisoner to come back; and witness saw him returning some thirty or forty yards off; never saw deceased any more; supposed the rocks prisoner threw, if they were rocks, would weigh some pound or pound and a half; Kent appeared to be hurt when he was running; saw no sign of any particular hurt upon him; Kent appeared to be some 15 or 16 years old, and he thinks he would weigh about 100 pounds, and rather a feeble boy; Asa Humphries was a large, stout man, and would have weighed about 200 pounds.

Cross-examination: Did not see deceased push prisoner back before he was in the act of falling; saw Humphries stamp deceased as many as three times on the breast, with great violence.

The State then introduced WILLIAM KIMBROUGH, who, being duly sworn, said: He was present at the grocery at the race ground, on the 4th of July last; saw the fracus between prisoner and deceased on that day in this, Fulton County; did not hear the first of the difficulty; heard a few words of quarrelling between them; prisoner accused Kent of rocking a house; deceased denied rocking the house, and said, he could prove himself clear, and that he was at home on that night; Costley had a knife drawn in his hand at the time; rushed on Kent, who rather begged off; prisoner kept rushing on him; about that time Humphries poked his head out of the window and said, Cann, damn him whip him; about that time prisoner threw a rock at deceased and missed

Costly *vs.* The State.

him; picked up another and threw it, and witness thinks, struck him on the shoulder; he struck him with the rock as they both made at each other; as they came together, witness saw prisoner with the knife in his hand, and he stuck the knife in the left side of deceased as they came together; Kent then caught prisoner by his hair as he cut him, and threw him on his all-fours and jumped on him; Kile then stepped up and threw Kent off some eight or ten feet; by the time he fell Asa Humphries commenced stamping him; there was a crowd around and witness caught Humphries and threw him off; Kent then rose to his feet and was making away, when William Roberson gave prisoner a stick and told him to beat him with it; prisoner struck at deceased, and witness thinks, missed him; Kent then started to run and prisoner after him, and threw the stick and struck him rather between the shoulders and knocked him down to his all-fours; deceased rose and run again, prisoner after him, and threw the stick again and struck him on the back of the head and knocked him on his all-fours again; deceased rose and still run; prisoner followed a little piece and threw the stick again, and as witness thinks, missed him; Humphries then hallooed and said, come back Cann, you have beat the damn rascal enough; deceased then got to a little skirt of woods and witness lost sight of him, until he got to a little open field; witness then went and found where deceased had fell and fainted, and helped to carry him to the house; deceased was called Sidney Kent.

Cross-examination: Prisoner had the knife in his hand before he threw rock, and when he threw, changed the knife from his right hand to his left hand.

The State then introduced JOSIAH KENT, who being duly sworn, said: Deceased was a son of witness; his name was Josiah James Sidney; called Sidney; he died the last day of July of the last year; Dr. Powell attended on him; he was the same person on whom they had the *post mortem* examination.

The cross-examination was not taken down, prisoner's Counsel not desiring it.

Here the State closed and Counsel for the prisoner introduced as a witness Dr. NOEL DALVIGNEY, who being duly sworn, testified as follows : Says that he is a physician and a surgeon ; has been practising about 35 years ; made the *post mortem* examination of deceased ; was called to see deceased on the sixth of July ; found him with a superficial wound on the left side, rather in the back, that he would call a cut ; patient was laboring under great difficulty of breathing, principally on the left lung ; several bruises were all over the chest along side of the spine, and also on the head ; the largest member of the bruises had the full shape of the heel of a boot ; the marks of the pegs were very distinct ; examined the cut and found it a superficial one, which witness did not think penetrated the cavity. On the first of August, was called to perform a *post mortem* examination by Dr. Westmoreland ; found the chest very much disturbed, principally on the left side. The puncture of a knife between the ribs into the cavity gave discharge to an enormous quantity of matter of a pinkish color ; on opening the chest found the left lung entirely collapsed ; the matter withdrawn out of the chest was about three pints ; the membranes of that lung were ushered together, it was so much destroyed ; the cavity of chest was carefully examined and several spots were found imprinted, which were marks of inflammation during life ; the largest about the size of a half dollar, and corresponding to the cut, the marks exactly corresponding to the external bruises ; examined the condition of the abdomen, and found its contents in a very good condition ; the condition of the chest, which would have produced the inflammation of the lung, in the opinion of witness, produced the death ; the cut, also, must have contributed to the inflammation very much. Witness does not think that the cut would have produced the death, and that the cut did not penetrate into cavity of the chest, and saw nothing which could induce him to believe so ; would not consider the wound, by itself, capable of producing

death, if well attended; it could not be classed among mortal wounds; the cut with the knife could not have produced the collapse of the lungs in two days; would consider the blow on the chest as much more likely to have produced this collapsed condition of the lung; the stamping of a stout man on the chest two or three times, might be sufficient to have produced the condition of lung; gave his testimony before the Magistrate was summoned on the part of the State.

Cross-examined: The immediate cause of the death was inflammation of the lung; there was a great deal of inflammation opposite the cut and the bruise, which contributed, together, to produce the death.

After argument on both sides had been concluded, the Court charged the Jury as follows—charging, among other things: that the first question to be determined was, whether a homicide had been committed; and if there had, the next inquiry was by whose act or agency it had been perpetrated; whether the prisoner there on trial, by any act of his, produced, or contributed to produce, the death of Kent; that if he did, the next and most important inquiry was, to determine under which of the several grades of homicide this was to be classed. The Court, in this connection, read from the *Penal Code* and expounded to the Jury the several grades of homicide, and charged them that it was their province to determine, from the evidence, whether it was murder, voluntary or involuntary manslaughter or justifiable homicide.

After which charge of the Court, the Jury retired and brought in the following verdict:

We, the Jury, find the prisoner, Cann Costly, guilty.
                                    THOS. BELL, Foreman.

After the rendition of which verdict and during said term of said Superior Court, before adjournment thereof, the said Cann Costly then and there, by his Counsel, moved for a new trial upon the following grounds:

1st. The verdict of the Jury was without sufficient evidence to support it.

2d. The verdict is decidedly and strongly against the weight of evidence in the cause.

3d. The verdict was contrary to the charge of Court.

4th. The charge of the Court was contrary to law, in that the Court said to the Jury that the main question for them to consider was, whether any act of Costly contributed in any way to the death of said Kent.

5th. That John McCarter, one of the Jurors who tried the cause, was an incompetent Juror, residing at the time of the trial in the County of Cobb, which was unknown to the prisoner or his Counsel, until after his conviction.

6th. That Joshua Butler, one of the Jurors who tried the cause, was an incompetent Juror, he having, on several occasions before he was impannelled to try said cause, expressed an opinion, unfavorable to the prisoner, to-wit: at one time said that Costly ought to be hung for murdering the poor boy Kent; and at another time said that Costly ought to be hung for murdering Kent; and that if he could get on the Jury he would hang him without regard to the evidence—the fact last above stated not being within the knowledge of prisoner until after his conviction.

The following affidavits were filed with the motion for a new trial:

CHARLES CANN COSTLEY, the defendant in the above mentioned case, personally being before the Court on his corporal oath, swears that since he has been convicted of the above stated case, he has been informed that one of the Jurors, John Butler, who sat upon his trial in the above stated case, was an incompetent Juror on the grounds following:

1st. That said Juror, Butler, before he was impannelled or solicited as a Juror, stated openly to one Thomas Carlton, that Cann Costly ought to be hung immediately, without Judge or Jury, and that if he could get on the Jury to try

him, (Cann Costly,) he would hang the said Costly in spite of all the evidence that could be brought in for the said Costly, for that he, the said Costly, was naturally of a mean disposition.

2d. This deponent has understood, since the verdict of guilty in said cause, that before said Butler was put on said Jury who tried him, he said to Mrs. Eliza W. King, wife of General George W. King, in speaking of the parties charged in the above stated case, jointly with others named as defendants in said indictment, in connection with this defendant, (Cann Costly,) that every one of them ought to be hung for murdering the poor Kent boy.

3d. This deponent has understood, since his said conviction as above mentioned for murder, and he has been informed, that one of the Jury, to-wit: John McCarter, at the time he was impannelled as one of the Jurors who found the verdict of guilty against this defendant, was a resident citizen of the County of Cobb in this State, and not a citizen residing in the County of Fulton, authorized to sit on a Jury; and this defendant further swears, that none of these reports came to the knowledge of this deponent until after the verdict was given which found him guilty as aforesaid, and that he believes the information above mentioned is true.

his<br>
CANN ⋈ COSTLY.<br>
mark.

Sworn to in open Court, 19th April, 1855.

B. F. Bomar, C. K.


The other Counsel for the prisoner having stated in their places that they knew nothing of the disqualification of the said John McCarter before said conviction, Amos W. Hammond, one of prisoner's Attorneys, made the following statement in writing: " Amos W. Hammond being called on by the Sol. General Bleckley, states that before the Juror, McCarter, was impannelled, he had heard that said McCarter had property in the County of Cobb in said State, and that

he wished one of the rail road agents would give him, the said McCarter, a free ticket for him and his wife to go home to Marietta; and said Hammond insisted on the said agent to give said ticket. That this is substantially all he remembers to have heard about the residence of said McCarter before he was impannelled; and that at the time this did not occur to him, nor afterwards, until the same was communicated to him in writing by Hiram R. Delay.

Signed,                              A. W. HAMMOND.

Counsel for prisoner also read with this the affidavits of Thomas Carlton, Hiram R. Delay and Mrs. King, upon the objections of the incompetency of said McCarter and said Butler, as follows:

GEORGIA, FULTON COUNTY:

Thomas Carlton personally came and appeared before me, attesting Notary Public, acting in and for said county, and after being sworn, deposeth and saith, that about two months back John Butler, one of the Petit Jurors who sat upon the case of The State against Cann Costly and others, indicted for the murder of James Kent of Fulton County, at the April Term of said Court, in which a verdict of guilty was found by the Jury against said Cann Costly, told this deponent, in speaking of the homicide of said James Kent, that Cann Costly ought to be hung immediately without Judge or Jury, and that if he could get on the Jury to try him, he would hang the said Costly in spite of all the evidence that could be brought in for him, for that Cann Costly was naturally of a mean disposition; and that this communication was never made to any one by this deponent, until after the verdict of guilty was found and delivered in Court by the Jury. And this deponent further swears, that another person was present when the conversation was had between this deponent and said Juror, Butler.                    THOMAS CARLTON.

Sworn to and subscribed this 16th April, 1855, before me,
AMOS W. HAMMOND, Notary Public.

Costly *vs.* The State.

GEORGIA, FULTON COUNTY:

Mrs. Eliza G. King, wife of Gen. George W. King, personally came before me, the attesting Notary Public, acting in and for said county, and after being duly sworn, deposeth and saith, that in conversation with Joshua Butler, one of the Jurors who tried Cann Costly for the charge of murder (with others) upon the body of James S. Kent, that the said Butler, before the trial of said cause, said to this deponent, in speaking of the death of said Kent, in connection with the two Humphries, Cann Costley, Roberson and Carlton, that every one of them ought to be hung for murdering this poor Kent boy; and she further swears, that she never communicated this fact to the said Cann Costly or any of the family, (not intending to testify in the cause unless compelled by law,) but to his mother, since the said Cann Costly was found guilty by the Jury and she says that she does not know the said Cann Costly personally; and until Mrs. Costly called on this deponent, since the finding of the said Cann Costly guilty, this deponent was not personally acquainted with Mrs. Costly.          ELIZA G. KING.

Sworn to and subscribed before me the 18th April, 1855.

AMOS W. HAMMOND, Notary Public.

GEORGIA, FULTON COUNTY:

Hiram R. Delay personally came and appeared before me, the attesting Magistrate, acting in and for said county, and after being duly sworn, says, that John McCarter, one of the Petit Jurors who sat on the trial of Cann Costly, who was found guilty of murder at the April Term of the Superior Court of said county, was not, at the time of sitting on said Jury, nor had been for any time during the last twelve months next before this time, a resident citizen of the County of Fulton; and the said Delay further swears, that said McCarter had been working with the deponent as a journey workman or jobber, during a greater part of last year, from August until he went to Marietta, which place he claimed as his home: at which place his family permanently resided, and where he paid his taxes for several years past and at his

VOL. ... N-79

Costly *vs.* The State.

deponent further swears, that during the time the said Mc-Carter was working for this deponent, that said McCarter was in the habit of going to Marietta, where his family resided, once in every two or three weeks, until the last time just before christmas; when, on account of the difficulty of collecting money, he had not been home in two or three months, when his hand became hurt; and from that time the said McCarter has not resided in Atlanta, but still resides in Marietta. 　　　　　　　　　　　H. R. DELAY.

Sworn and subscribed before me,
　T. G. THOMAS, J. P.

Upon hearing of which affidavits, the Court granted said rule *nisi* of the Solicitor General, and gave him until next term of said Court to show cause why said new trial should not be granted. At which term of the Court the Solicitor General exhibited for cause the following affidavits:

GEORGIA, FULTON COUNTY:

Before me, Samel B. Hoyt, a Justice of the Peace in aforesaid county, personally came Joshua Butler, who being sworn, deposeth and saith, that he has heard read an affidavit purporting to have been made by Eliza G. King before A. W. Hammond, Notary Public, and one purporting to have been made by Thomas Carlton before said Hammond, touching expressions which this deponent is alleged to have made, in relation to the case of The State *vs.* Cann Costly, lately tried in the Superior Court of said county. This deponent states, on oath, that he never did make use of any such expressions or any thing like them; he never has conversed with Mrs. King or in her presence, about the case or the killing of Kent, or about any of the parties charged therewith; in fact, he has never spoken more than half dozen words with her in his life, and does not believe he would know her if he were to meet her in the road. With Thomas Carlton this deponent never has had a word of conversation, that he recollects, touching said homicide or any of the parties indicted for the same; and he knows that he never told him or any

other person that Cann Costly ought to be hung, or that if he (deponent) could get on the Jury he would hang him. Deponent further states, that up to the time he was sworn as a Juror to try said Cann Costly, he never had formed or expressed, either from rumor or otherwise, any opinion as to his guilt or innocence ; he did not see the crime committed, and had heard very little about the matter from report or rumor. From the little he had heard, he was disposed to look on the case favorably for Costly, and was somewhat surprised to find, on the trial, that the evidence was so strong against him. Deponent had no bias or prejudice resting on his mind against said Costly, and was influenced, solely and entirely, in agreeing to the verdict in said case, by the evidence and the charge of the Court. He is confident that throughout the trial, he could and would have allowed, and did allow, full weight to any evidence going to show the innocence of the prisoner.                       JOSHUA BUTLER.

Sworn to and subscribed before me this 19th April, 1855.

S. B. HOYT, J. P.

GEORGIA, FULTON COUNTY:

Harrison Bryant being sworn before me, says that he was one of the Jurors who tried Cann Costly at the present term of the Court, for murder, and that there was no other verdict proposed than the one found, and that he heard no one propose to find the defendant guilty of a less offence than murder ; and further states, that his fellow-Juror (Butler, whose given name he does not know,) behaved himself in a prudent manner, and did not appear to have any prejudice in the case.

HARRISON BRYANT.

Sworn to before me this the 20th April, 1855.

L. C. SIMPSON, N. P.

The Court over-ruled the motion, and refused to grant the defendant a new trial, and Counsel for defendant excepted.

UNDERWOOD ; HAMMOND & SON, for plaintiff in error.

BLECKLEY, Sol. Gen. for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] If the Juror, John McCarter, was not qualified, it was but cause of challenge *proper defectum;* and could have been made by the prisoner, and must have been made before the Juror was sworn. And it is well settled, both by the authorities of the Courts of Great Britain and of this State, that it is too late, after a Jury has been sworn, to challenge any of its members *proper defectum;* or to move to set aside the verdict on that account. (2 *Com. Digest,* 322, *title Challenge Peremptory, letter C;* 1 *Chitty Crim. Law,* 440, 441, 541; 4 *Dallas,* 353; 2 *Bay.* 150; 7 *Cranch.* 290; 3 *Bacon,* 750; *Coke Litt. b.* 155; *Dudley* (*Ga.*) 85; 2 *Ala. R.* 275; 2 *Man. & Ry.* 309; 8 *Barn. & Cr.* 252.)

Some of the cases cited show that the Jurors taken were wholly disqualified to serve, if objected to—some aliens, some infants, &c. who are no where allowed to serve on Juries, if challenged. And these cases and others clearly establish the rule, that if such disqualified Jurors are taken and not objected to, or challenged before being sworn, they cannot be set aside except for matter subsequent to such swearing; and their verdicts, both in criminal and civil cases, are as binding and valid as if they had possessed the proper, full, and in all respects, requisite qualifications. And it makes no difference whether such want of qualification was known or unknown at the time the Juror was sworn. In either case, the verdict must stand and the judgment follow it. (2 *Porter R.* 100; 3 *Stewart,* 454; 1 *Yerger,* 219; 8 *Ib.* 508; 1 *Institutes,* 108; 3 *Vin. Abr.* 11, 764; 2 *Hawk. Pl. Cr.* 43; *Yelverton's Rep.* 24.)

But it is needless to discuss this question. Since the decision in the case of John Epps, at *Gainesville,* Oct. 1855, and the construction there put upon the *38th section of the Judiciary Act of* 1799; (*Cobb* 546) it is too late now to consider this a debateable point.

[2.] As to the Juror, Butler, we are unwilling to control

the opinion of the Circuit Judge as to his competency, resting as it does, wholly upon the credibility of the Juror and his assailants.   If *he* is to be believed, he was an impartial Juror—if Carlton and Mrs. King, he was not indifferent.   We would not undertake to disturb the finding of triors—why should we that of the Court, sitting *quoad* this point in the place of triors ?   It is with great and increasing reluctance that we will sustain any objection to a Juror, after verdict, when no attempt was made to test his disinterestedness before being sworn.   The ancient rule, as laid down by *Coke, Hale and Hawkins*, was *against* this practice; and the sooner we return to the doctrine as maintained by them, the better.

[3.] The provision in the Constitution of 1798, that " trial by Jury, as heretofore used in this State, shall remain inviolate", has been invoked in aid of both of the foregoing grounds.   We apprehend that nothing more is meant than what is found in the Constitution of 1777 and reiterated in the Constitution of 1789, that " trial by *Jury*," (as contradistinguished from any other *mode*) " shall remain inviolate forever."  (*Watkins' Dig.* 16, 29.)  And if any importance be attached to the words " as heretofore used in this State" in the Constitution of 1798, we answer, that before the adoption of the Constitution of 1798, it was expressly enacted that " no exception against any Juror on account of his qualification, shall be allowed after he is sworn."  (*Watk. Dig.* 627.)

There is no conflict, therefore, between the Constitution of 1798 and the 38*th section of the Judiciary Act of* 1799, inasmuch as the mode of impannelling a Jury designated and required by this Act was, that which was in use in the State at the adoption of the Constitution of 1798.

And we embrace this occasion to repeat, emphatically, the position taken by this Court in 5 *Ga. Rep.* 194 *et passim*, and again and again occupied before and since, namely : that this provision in our Constitution was intended merely to secure the individual from the arbitrary exercise of power, unrestrained by the great fundamental and established principles of private rights and distributive justice.  But that the forms

of administering justice and the duties and powers of Courts, as incident to the exercise of a branch of sovereign power *must ever be subject to Legislative will.* Is not the method of drawing, summoning and impanneling both Grand and Petit Juries entitled different in this State from what it is in England? And yet, what defendant has ever challenged the array on that account? Could it be made to appear that a Statute of the State produced a total prostration of the trial by Jury or involved the accused in difficulties which rendered that constitutional right unavailing for his protection, we might, under such circumstances, consider ourselves called upon to interfere. *No such Act has been passed.* It would be disrespectful to anticipate such an improbability.

As to the other formal exceptions we do not deem them deserving of a serious notice. That a most brutal murder was perpetrated, no one who reads the evidence can doubt. And the most that can be said in favor of the defendant is, that his agency in the tragedy was not quite, perhaps, so diabolical as that of *one other* of the accomplices. It was quite sufficient, however, as to justify fully the verdict of guilt, which was rendered against him. A Jury returning any other, upon the testimony, would not assuredly have escaped being *attainted,* did that ancient Common Law practice still prevail in Georgia.