Mr. Justice Cox
delivered the opinion of the Court:
We have examined the testimony in this case, as reduced to typewriting, the briefs of counsel and the authorities cited and have given them the consideration that the gravity of the case demands. The case has really been argued before us as if it were to be tried here de novo on both the law and facts. *372 It must be remembered that we can only look at the case in respect to the errors alleged to have been committed at the trial, and can only reverse the rulings of the Court at Special Term when we find plain error in the record calculated to injure the defendant.
The defendant was indicted for murdering his wife on the first day of October, 1889. The case which is claimed to have been made out by the Government is substantially as follows: “The defendant and his wife resided with her mother on Eighth Street between D and E south, and on the evening of October 1, 1889, they were heard quarrelling in their room. He was announcing his intention to go out and spend the -night, and she declared that she would follow him where ever he went. He replied that if she did follow him he would kill her, and in that temper they left the house and proceeded northwardly along Eighth Street to Virginia Avenue and in a northeasterly direction on Virginia Avenue towards the corner of C street and Seventh street, and about that time and about that place another person testifies that he heard a conversation of a similar character; that is, heard a man say to a woman, that he would shoot her; that he would be damned if he would not shoot her if she did not go back-, and finally the parties reached C street and proceeded along C street to about as far as the third tree-box. Another witness then heard him repeat the declaration that if she followed him he would kill her, and finally he saw him raise his hand and fire, and she fell. She was carried home and on the tenth of the month died in consequence of the wound.
The theory of the defense is suicide; and there are one or two points relied upon as tending to establish that theory. It appears that before the marriage of the defendant with his wife, who was killed, or who shot herself, the defendant had illicit relations with another woman, and his wife was intensely jealous of him in that regard, and had, in all probability, been suspecting him that evening of an intention to visit the woman in question, and, as confirming that fact, they say that he was walking in the direction of the residence of that woman on the occasion of the trouble. It is claimed *373 by the defense that, in a paroxyism of jealousy, the wife took her own life.
The Government, on the other hand, claims that the very fact of the deceased following him excited him into an ungovernable fury, and thereupon, and in the heat of passion, he committed the murder.
At the trial, there were a number of exceptions taken to the rulings of the court, in excluding testimony and permitting testimony to be received. Some of them are admitted not to be well taken. As always happens, they were taken in the hurry of the trial, but have been abandoned. Others are objections taken during the trial but which were obviated by subsequent rulings. None of them have been insisted on in the argument and it is not necessary for us to examine them.
One of the most important witnesses on the part of the prosecution was one James A. Shreeve, who had formerly been a resident of Washington, and who claims to have been an eye witness of the tragedy. This case has been tried twice. He was not examined on the first trial. He says that he purposely concealed his knowledge of the affair. He left Washington and went to Chicago to live, and was summoned and brought here as witness on the second trial. Upon the cross-examination of Shreeve he was asked the question, “Where are you stopping?’’ And that question was ruled out on objection. That is alleged to be error, and is the subject of the first exception that has been discussed. On the argument it was claimed that the defense had the right to know, and show to the jury, all about the antecedents and associations of the witness. If that was the object of the inquiry, I have no doubt that it was a legitimate inquiry, and if that had been stated to be the object, we take it for granted that the judge who tried the case would have allowed an answer to be given. But it becomes a little doubtful, when we look at the colloquy between counsel accompanying this offer, whether that was, or not, the object. It appears from this colloquy that the attorney for the United States claimed that this witness was shadowed by several persons as soon as they became advised of his arrival in Washington, *374 and in consequence he changed his residence. Counsel for the defense stated that they had people engaged in looking after his antecedents, from which it seems to have been a not unreasonable suspicion that the object of this inquiry was to put the defense upon the track of witnesses who might discredit Shreeve. Now, it is perfectly allowable to interrogate a witness as to his antecedents and associations. It does not seem to be a matter of right, however, to interrogate a witness simply to enable the interrogator to hunt up evidence as to himself and his character. This rule has been laid down by the Supreme Court, and they have laid down a still broader rule, which is, that while cross-examination, as to matters that relate to the main issue, is a matter of strict right, yet when it relates to the credibility of the witness, the scope of it is to be governed by the discretion of the trial justice, and his ruling upon such questions is not reviewable. That subject was discussed by the Supreme Court in the case of Storm vs. United States, 94 U. S, 76. This was an action upon a bond given to secure the performance of a contract to furnish certain quartermaster supplies to the Government. On the contractor’s failure, the agent of the Government went into open market and bought the supplies required, and this suit was brought upon the bond to recover the difference in price. The counsel for the defense asked of the witness the names of the parties from whom he bought the supplies, or certain parts of the supplies, and that was objected to and ruled out. The Supreme Court say: “Seasonable exception was taken by the defendants to the ruling of the court, excluding the question propounded to the witness called by the plaintiffs, of whom he purchased the quantity of oats which he furnished the United States. Three grounds are suggested to show that the defendants were entitled to have an answer: (1) That the answer might have affected the credibility of the witness. (2) That the defendants, if the name of the seller of the oats had been given, might have called him as a witness, and perhaps might have proved by him that the price paid was not as great as represented, or that a less quantity than that charged had been delivered. *375 (3) That the answer might have shown that persons had an interest in the sale of the oats who were prohibited by the contract from having any share in furnishing such supplies.
‘ ‘ None of the reasons assigned to support the exception are entitled to any weight, when considered in connection with the explanations given in the bill of exceptions. Evidence of an undisputed character had previously been introduced, showing that the requisitions for such supplies ■ were not in excess of the quantity prescribed by law, and that the United States did not purchase and pay for any. greater quantity than that specified in the requisitions, and that the purchases were made in the open market, and that the prices paid did not exceed the fair market value of supplies purchased.
‘ ‘ Litigants ought to prepare their cases for trial before the the jury is impanneled and sworn; and, if they do not, they cannot complain if the court excludes questions propounded merely to ascertain the names of persons whom they may desire to call as witnesses to disprove the case of the opposite party. Courts usually allow questions to be put to a witness to affect his credibility; but it is plainly within the discretion of the presiding judge to determine whether, in view of the evidence previously introduced, and of the nature of the testimony given by the witness in his examination in chief, it is fit and proper that questions of the kind should be overruled, and to what extent such a cross-examination shall be allowed.”
We think, therefore, in the first place, that there was no error in disallowing the question for the reason that the object of it was not made plain, and it was at least within the power of counsel by a single addition, if they desired it, to say that they wished to show that the witness was consorting with thieves, or disreputable characters, or such like, and that his character was affected thereby; and for the further reason that it seems to be plainly in the discretion of the court how far the cross-examination, going to credibility, shall go. The same thing is said in the Supreme Court in two other cases, viz: that of Rea vs. Missouri, 17 Wall., 532, and Johnston vs. *376 Jones, 1 Black., 209. It does not seem therefore, to us, that this was an error that we can review.
Then come the following exceptions, Nos. 5, 8, 9 and xor relating to questions addressed to Officer Henry, as to what the defendant did at the time that he was arrested. For example, ‘ ‘Did he not begin to cry soon after you put your hands on him?” “Did he not say, in response to the question as to what you arrested him for, that he did not shoot his wife ?” Now, the obvious objection to those questions would be that they would allow the defendant to make testimony for himself by his own declarations and conduct. It is said in argument, that the language and conduct accompanying an act, are explanatory of it, as a part of the res gestee and are always admissible. When an act is admitted to be done, and its import is doubtful, then the rules of evidence permit such testimony. For example, when the proof is about the act of taking possession of property, and the question is whether the party took possession with a claim of right, or as a tenant of some one, the declarations accompanying the act are of course admissible, as showing the meaning and intent of the transaction. But in this case, it is quite obvious that under no rule of evidence can the defendant be allowed to put in his own declarations, because they go, not to the character of his act, but to the denial of the act itself. Of course the Government can prove anything that he said which was adverse to his defense.
A kindred question was addressed to Fenwick. It was in reference to the defendant’s conduct at the time or about the time of the shooting, and the endeavor was to show that he was in mental distress. That was putting in his conduct as-evidence in his own defense and also putting in evidence the opinion of a witness as to what that conduct indicated.
Another exception was to the exclusion of a question to Ruth Turner, the sister of the deceased, when she testified that she heard the same threats that her mother had testified to when the defendant and the deceased were in their room. The question was: “You did not- think it amounted to anything, did you?” It was simply asking the opinion of the *377 witness. She could be asked whether the threats were made in an angry manner or a playful manner, but her opinion as to whether the threats amounted to anything does not seem to us to have been admissible.
Exception 22 is to the disallowance of a question propounded to Dr. Crook, who was called for the defense. He is one of the surgeons who attended the deceased. The question is: “I will ask you if you did not say on the previous trial that if no obstruction had intervened the ball would have passed in, coming out a lower point?” This question was not allowed to be asked. The first objection to it is that it is obviously cross-examination, and he was the defendant’s own witness. And in the next place it is an attempt to show what he testified to on a former trial, which is never allowed except when the witness is dead, or has departed from the jurisdiction and cannot be produced. When he is present he must give his present knowledge of it and not testify to what he said before. And when it is stated that the object of an inquiry was to simply refresh his memory by a reference to what he said before, the answer is, that he can only refresh his memory by reference to some record or entry or memorandum and not by hearing his former oral testimony repeated to him.
Exception 24 is to the exclusion of evidence to the effect that some six months before the shooting, and three months before the marriage of Hattie Cross with the defendant, she bought a revolver and made some declaration, as to her intention, under certain circumstances, to use it upon herself. The court excluded that because the testimony was too remote, and could not have any sort of bearing upon the transaction; and we think properly.
Exception 28 is to the exclusion of an answer of Dr. Hamilton to a question propounded to him on the former trial. He was sworn upon the former trial and his testimony reduced to writing.
It was agreed by counsel that it should be read on the second or recent trial and the question asked him was: ‘1 Can *378 you tell us from your knowledge and experience of gunshot wounds, whether that pistol was fired close to the head or not? It seems a little uncertain whether that should not have been admitted, but it seems to us entirely immaterial whether this pistol was held close to the head of the deceased or not. The argument is that if it was close Hattie must have held it herself. We are totally unable to see the materiality of the inquiry. It was equally possible for the deceased or her hus* band to hold the pistol near her head, and it does not seem to us that the question has the slightest bearing upon the issue.
Exception 29 is of the same character as the previous exceptions, as to evidence relating to the conduct of the defendant. His father was asked what his conduct was at the time that he told him of the shooting. That is open to the same objection as the other questions addressed to Officer Henry.
Then there are several exceptions, 30 to 34 inclusive, addressed to an explanation of .the object of the defendant in going in a southerly direction after the shooting took place. It appears that he went in that direction. He went first to the house of his mother-in-law and told her that Hattie had shot herself. They started out together, and after he went with her a little way, his mother-in-law accusing him of the crime, she says that he ran south. The object of these inquiries was to show by the father that he went to his residence and afterwards came back to Eighth street near the dwelling of Mrs. Turner, and afterwards he started to go to his brothers. The Government having proved that he was seen by the officer leaving his father and going in a southerly direction, it was claimed that he was really taking flight in the direction of Eong Bridge, and the offer was to show by the father that he was going at his- request, to the house of his brother who lived in the direction of Eong Bridge, a considerable distance from where he was standing, and ■ was to return to him. Now, while the evidence was objected to and partially excluded at first, yet, in point of fact, it did get in. The father was really allowed to say that the defendant started in the direction of his brother’s house and *379 was to return to him, and he was waiting there for him to come back. So that it was really not excluded, although the court seems at first to have thought it objectionable. The father did get the evidence in, at least so far as to say that he had seen his son start off in the direction of his brother’s and that he afterwards returned to him. But as the officer approached him then, he took flight, and the evidence would not, of course explain that.
There is one exception which probably is well taken, although we think the effect of it is very slight. Mrs. Turner had testified in chief as to the different threats which she had heard addressed by the defendant to her daughter in their room. Of course it was important to- discredit Mrs. Turner, and her next door neighbor, a man named Richard Williams, was offered and testified that he occupied the adjoining house; that he was sitting in the middle of his house, eating his dinner or supper at the time that Cross went 'there. He was asked whether he heard Mrs. Turner say to Cross, what she testifies that she did say: “You are a liar; you shot her yourself; you said that you were going to do it.” That evidence was excluded. The object, of course, was to discredit Mrs. Turner, and throw some doubt upon her testimony as to the threads that she testified that she had heard. The answer in the negative, in reply to the question was a very feeble contradiction of Mrs. Turner. It could have had but a slight bearing upon her credibility, and if nothing further than that appears in the case, we do not think that it is sufficient to justify the court in treating it as a ground of reversal, although it does strike us that the evidence would have been properly admitted. We shall proceed further to consider the other features of the case.
Exception No. 42 was to the admission of the record in the Marshal’s office as to the height of the defendant. It seems that he was called into a room in the Marshal’s office, and his measurement taken, and that was done after he was convicted at the first trial. It appeared that Mr. Carroll was the clerk, and testified that there is a book kept in the office of the Marshal in which all the measurements of convicted persons *380 are kept, and a description of the convicted persons written down and furnished the Department of Justice. They are required to keep that book and the. practice was for somebody to take the measurement and call it out to him, and he reduced it to writing. He identified the book produced as the one used, and then gave the measurement of the defendant. That was objected to on several grounds. First, it was said that it was hearsay on the part of Carroll, because he did not take the measurement; he simply took down what the other person called out to him. Upon looking at the testimony itself, we find that this question was addressed to him: “Did you know it at the time that it was taken,” and the answer is, “Yes, sir.” This seems to be an assertion of personal knowledge of the fact. If that be the case, it removes the objection, because that is personal knowledge; not mere hearsay. But independently of that, it seems to us, in the light of the law relating to private entries made by persons in the course of duty, the evidence would be admissible, even assuming that Carroll simply took down the measurement made by another man without verifying it himself.
In a complicated transaction in which two persons participate, we do not think that it is essential that each one should have personal knowledge of all the steps in the transaction. For example, a merchant in his store in selling goods calls out the price and the character of goods, and his clerk writes them down. That is in the regular course of business, and it would not be necessary that the clerk should follow the merchant around and to have personal knowledge of all that passed between him and his customer. As I say, it is not necessary that each person connected with the transaction resulting in an entry made in the due course of business and in the discharge of his duty should have such personal knowledge, but it is simply important that the entry should have appeared to have been made in the regular course of business, and in the light of that rule it would seem that this entry would be admissible. See notes to Price vs. Farl of Torrington, i Smith’s Reading Cases. But there is another ground upon *381 ■which I consider that it is admissible, and that is, that it is a record kept in a public office and in the discharge of a public duty and that it comes under the rule laid down by the Supreme Court in the case of Village of Evanston vs. Jessie Gunn, 99 U. S., 660, in which Mr. Justice Strong, delivering the opinion of the court, says:
“They come, therefore, within the rule which admits in evidence ‘official registers or records kept by persons in public office, in which they are required, either by statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties or under their personal observation.’ To entitle them to admission it is not necessary that a statute requires them to be kept. It is sufficient that they are kept in the discharge of a public dirty ” '
We had a very similar question in a recent insurance case where there was offered in evidence an abstract from the return of the naval hospital, in which was stated the condition of health of the party whose life had been insured, and the object of the record was to show that he had falsely represented the condition of his health. These records are kept in naval hospitals and copies sent to the Navy Department and abstracts are obtained from the Navy Department, and a certified copy of such an abstract as made at the Department, was introduced into evidence in the case. We found a case almost identical, which was decided by Eord Ellenborough in 5 Espinasse, 118, in which it was held that' a book containing a copy of returns made by officers of ships of persons dying on board to the inspectors of wills was admissible to prove a death.
It appears in the present case, that this record was required to be kept for the purpose of supplying the Department of Justice with a description of convicted persons, which corresponds very nearly to the case cited from Espinasse, in which the record of a death was transmitted to the ecclesias. tical court for the purposes of adminstration. We do not think that the record in question was obnoxious to the objection that I have mentioned.
*382 But there is still a further objection made to it and that is, that it is an effort to compel the defendant to give evidence against himself. It must be remembered that when this measurement was taken,the defendant was convicted,&a&., therefore, it was not taken with the view to a trial or for use upon a trial. There does not seem to be any reason why it could not be used after it had been taken under the circumstances stated. It could not be contended that the knowledge of the size or height of a man acquired in any other way, for instance by a tailor, could not be used when at the time it was not taken for the purpose of being used as testimony, and it seems to us that a record taken as this was, for a lawful purpose and under the rules of the office might be made use of afterwards. It does not seem to us that it is compelling the defendant to give evidence against himself, although some cases that have been cited to us go very far in that direction. There was one case holding that it was error for the prosecuting officer to compel the prisoner in court to put his foot into a vessel filled with mud in order to measure it and identify it. That is well enough. It was held in another case that where the officer compelled the defendant to put his foot in certain tracts that were discovered, in order to identify him, that was wrong,' as it was compelling him to give evidence against himself, and evidence of that kind, so secured, could not be used. We think that is going very far; it is rather too fine. What would be the consequence if such evidence should be entirely excluded ? You could not compel a person after his arrest to empty his pockets and disclose a weapon, when the most vital evidence on the part of the Government, in a homicide case, is the possession of the deadly weapon.- Could you not compel him to open his pocket-book and exhibit papers that might be conclusive in the case of a forgery, or anything of that sort ? We think that officers having a prisoner in custody have a right to acquire information about him, even by force, and that, for example, when his photograph is taken or his measurement taken, it is simply the act of the officers and is not compelling him to give evidence against himself. Besides, it is hard to see how the result of *383 this trial could have been avoided in any way by the exclusion of this evidence. It is admitted on both sides that there was a difference in height between these parties, and that the wife was a little taller than her husband. But not the slightest light is shed upon the issue in the case by any evidence as to the comparative height of these parties, so far as we can see after examining the whole record of the testimony.
Now, another ground for the motion for a new trial is the alleged misconduct of the prosecuting officer. The misconduct in question is alleged to be of two kinds — first, what occurred in the course of the trial, within the observation of', the Court, and next, misconduct which is only shown by reference to antecedent and extraneous circumstances and which does not appear upon the face of the proceedings.
First, it is objected that the District Attorney announced, in his opening statement, his intention to show, by the dying statement of the deceased, the fact that her husband had shot her, and then they offered evidence tending to prove it, but, as the defense say, totally insufficient to lay the foundation for introducing such a statement. Then the prosecuting attorney announced that he had other witnesses by whom he might be able to lay a better foundation. The record shows that the testimony of Mrs. Turner, the mother of the deceased, was first taken, and then she was recalled for the purpose of introducing the alleged dying declaration. The next morning after the shooting she had a conversation with her daughter about dying; it was about 6 o’clock, just the time for her to take her next medicine. She said that she did not want to take it, and “I said, Hattie, take your medicine; I says you do not want to die and leave your mother and your little sisters and brothers, and she says, ‘Well, you have a plenty left.’ ” She was asked whether her daughter took the medicine, and she said that she did. On the third morning after the shooting she had another conversation with her: ‘ ‘We had a pet dog named Grant; the little dog came into the room around her bed, and she called him andshesays,‘Grant! Grant!’ she says, ‘even the poor little dog don’t know his name since I have been sick; poor Grant,’ she says, ‘will not have any *384 one to teach him his name any more.’ She was shot Tuesday night, and the first conversation that took place was on Wednesday morning and the second conversation took place on Thursday morning.” Some Christian people, she testified, came out and talked with her daughter, and the minister asked her if she trusted in the Ford, and she said “I have no one else to trust in;” she says, “You know I can’t trust the devil.’ ’
Then she was asked how long she was at the house before she became conscious and she said it was about io o’clock, and she remained conscious then off and oh all night, and she remained conscious up until Friday afternoon of the same week that she was shot, because she noticed that she knew everybody that came in the house until Friday afternoon until about 4 o’clock and then she began not to know people like she had done. She first said something about the shooting at about xo o’clock the same night and again on the next morning, and the minister first came to talk with her the next day after she was shot. The trial justice thought that that was not sufficient for the admission of the alleged dying dec. laration, probably on the ground that her consenting to take the medicine indicated a hope, at least, on her part, of recovery. This testimony indicates a mind certainly clear at intervals, and what she said on those occasions was perfectly rational, and it comes very near indicating a consciousness of approaching death. One word more from her would have made it sufficient. If she had refused to take the medicine, saying,“that it is no use, I am dying,” her statement would have been admissible.
Now, looking at that alone, we cannot see that there was any misconduct on the part of the District Attorney in offering the evidence. It was doubtful enough for the court to exclude it, and the court concluded, on the whole, to exclude it. So far, there has been nothing that amounts to misconduct on the part of the District Attorney. This was followed by the announcement that he would discharge the witness under the court’s ruling that this evidence was insufficient, and he thought that he had other witnesses by whom he might lay a better foundation.
*385 I should have stated here that among the grounds assigned in the motion for a new trial is the following:
“Because of gross misconduct on the part of the prosecuting attorney during the trial to the prejudice of the defendant.”
It does not specify the misconduct and the only specification we have of it is found in the affidavit of Cross, in which he says, “that he is advised and believes that the opening remarks of the assistant attorney for the United States, to the effect that the affiant’s wife had made a dying statement in which she said that affiant had shot her, and they offered to prove such dying declarations by the witness Emma Turner, and the remarks of the District Attorney after such offer had been excluded by court, that he had other witnesses by whom he could strengthen his position, all tended to, and he verily believes did, prejudice his case with the -jury; that he is advised and believes that when the above statements and offer were made by counsel, they (counsel) had been informed by the attending sztrgeon in charge of the case that affiant’s wife could not make and was totally unable to make a rational or connected statement.” The affidavit does, not correctly represent the declaration of the District Attorney. He simply said that he had other witnesses by whom he might be able to lay a better foundation-, not strengthen his position generally, but lay a better foundation, which means, simply, to prove more satisfactorily that the deceased, at the time of her statement, was in a condition of mind to make a rational statement, and also that she then . expected certain death. The objection is, that the District Attorney should make such a statement without having any witnesses, which is evidenced by the fact'that he did not produce any witnesses. He stated that he might be able to lay a better foundation, and his action in this regard does not seem to us to be so clear an act of misconduct as could prejudice the case. He did not assert that he intended to prove the dying statement by any other evidence, but simply to lay a foundation by proving the condition of the deceased. But there is an answer, beyond that, to the objection. It is a rule well recognized by the Supreme Court and by all the authorities that anything that occurs during a trial, which *386 might prejudice the accused, he must call attention to, and have passed upon; by an instruction of the court. There maj be cases where the rule may be dispensed with, but in this case it was very easy for the counsel to ask the judge to say to the jury that they must consider the evidence offered, of dying declarations, to have been valueless and as excluded entirely from the case. Now that is the rule as to the manner in which any misconduct of that sort should be redressed, as laid down in several cases. In the first place, it is discussed at considerable length in Thompson on Trials, beginning at page 743, and although he states that in some jurisdictions the defendant is allowed to make this objection to the conduct of the prosecuting attorney on a motion for a new trial, the better rule is shown to be, that it should be done during the trial, so that it can be redressed at once. The Supreme Court takes this view of the case in Crumpton vs. The United States, 138 U. S., 361. They say: “The second assignment of error is clearly untenable. It appears that during the argument of the case the defendant’s counsel said to the jury: ‘Either the defendant or Burt (a Government witness) is guilty of this crime. I will show you that Burt is guilty, and, therefore, the defendant is not.’ In reply to this the District Attorney, in his closing argument said: ‘The issue then is squarely made by Mr. Neal that either the defendant or William Burt is guilty of this crime. I have shown you that Burt is not guilty; therefore, by his logic the defendant is guilty. ’ No obj ection was made at the time to this argument, nor was the court requested to interrupt it, or caution the jury against its force; and no exception appear to have been taken. There is no doubt that, in the excitement of an argument, counsel do sometimes make statements which are not fully justified by the evidence. This is not such an error, however, as will necessarily vitiate the verdict or require a new trial. It is the duty of the defendant’s counsel, at once, to call the attention of the court to the objectionable remarks and request its interposition, and in case of refusal, to note an exception.”
*387 In the case of Hopt vs. Utah, 120 U. S., 430, it appears that the counsel for the prosecution alluded to a former trial of the same case which was in violation of the statute. Upon objection being made, the counsel withdrew his remark and the court instructed the jury that they should disregard the same. The Supreme Court said that the action of the attorney in that matter was not a ground for a reversal of the judgment. As far, therefore, as any conduct of the prosecuting attorney apparent on the face of this proceeding is concerned, we do not think that we are called upon to make it a ground for reversal.
Another specification, however, is found in the twelfth reason assigned for a new trial: “Because of misconduct on the part of the prosecuting attorney in attempting to prove by the mother of the deceased the dying declaration alleged to have been made tinder circumstances which to him were known to have afforded no sufficient grounds for the admission of such declarations." The ground for this is shown in an affidavit filed, stating that before the offer to prove the alleged dying statement, Dr. Crook, the surgeon, had informed Mr. Armes, assistant attorney, that the woman was not capable at any time, from the time that she was shot, of making a rational statement as to the occurrences at the time of the shooting, and it was alleged that, with that knowledge, the District attorney offered the above statement to the prejudice of the accused. Now, there have been other affidavits, counter affidavits, filed on the part of the District attorney, and I will state the substance of them without undertaking to determine that controverted statement of fact. The District Attorney claims that Dr. Crook, when he first visited this woman, was of the opinion that she was capable of making a rational statement, and that he so testified before the coroner's jury.
There is also filed the affidavit of the coroner himself to the . same effect, i. e., that Dr. Crook testified before him that the woman was capable of making a rational statement. The Government further says that, during the progress of the first trial, it was advised that Dr. Crook had changed his opinion *388 since the autopsy and had come to the conclusion that no person with such a wound, i. e., with a ball traversing the brain, was capable of making any rational declaration. He was sought by the District Attorney, and he informed the latter that he had so changed his opinion since the autopsy. The District Attorney claims, however, that he had a right to rely more upon an opinion, founded on a personal inspection of the woman, than a mere medical abstract opinion given afterwards — that is, a medical opinion to the effect that with such a wound no person could make a rational statement. Now, if he seriously believed that, and we have no reason to doubt that he did, we are not able to see why the District Attorney had not the right to raise that question and present it to the jury. After the counsel for the defense had ascertained that fact from Dr. Crook and the District Attorney was advised that he would so testify, he had a right to bring before the jury the question whether' the first opinion of Dr. Crook and the evidence of Mrs. Turner were not sufficient to satisfy them, notwithstanding the medical opinion expressed afterwards— of the doctor — that the woman was incapable of making a rational statement. There was only one way by which he could do that. He could not summon Dr. Crook and exam, ine him, because he knew that his testimony was adverse to him. He could not cross-examine his own witness. But after this testimony had been admitted as prima facie evidence, it was in the power of the defense to produce Dr. Crook, and then it would have been competent for the District Attorney to cross-examine him and show the fact to be that he had previously testified to the effect that I have already mentioned. The decision of the court was that the foundation had not been laid, but if the decision of the court had been in favor of permitting the testimony to be taken, then we cannot see why other testimony could not have been introduced in that way; and it does not strike us that there was any misconduct on the part of the District Attorney in attempting to introduce the evidence as it was done. But there is a broader question behind all that. It is contended here that the District Attorney offered this evidence with the *389 knowledge that it was false; in other words, it is assumed that he was bound to take Dr. Crook’s later opinion as conclusive of the question, and it assumes that he thereafter offered the evidence with knowledge in advance that it was not true. Now, the question is, can the court, on a motion for a new trial, try the District Attorney for errors in the discharge of his duty? Can the court go into an inquiry as to how far the prosecuting officer is justified by the evidence in his possession in attempting to prove the guilt of the accused? The cases all relate to the conduct upon the trial. For example, where a district attorney gives his personal belief of the guilt of the accused or states it as within his personal knowledge that the defendant is guilty, when the evidence to support that belief has not been admitted, these are plain cases of misconduct attending the trial. But if it was allowed to institute an inquiry of a character that I have mentioned, there is no case in which an affidavit could not be offered, after the trial, to the effect that the District Attorney had been heard to say that he had no confidence in the witnesses he had produced, or that he knew that the witnesses were not worthy of belief. We find no authority to justify a court in a proceeding of that kind. The District Attorney has assumed the responsibility of presenting the case according to his judgment, but for any irregularities in the course of the trial he is, of course, open to "the censure of the court. In the first trial of this case, it was thought by the court, in reviewing the case, that he 'had transcended the bounds of his duty' during the trial, because, first, he proposed to introduce the dying statement without having laid any foundation for it. He asked Mrs. Turner about it without making the proper preliminary inquiry, and that was ruled out. Uater on, he made a like offer in the case, and three times attempted to press the inquiry without offering any further testimony, and the court thought, on the face pf the proceedings, that that was improper. We are not sure but that in a case of that sort the reviewing court properly granted a new trial. The general rule, however, as we have already stated, is, that when irregularities of that *390 kind occur, they ought to be corrected on the instant, by an application to the trial justice. We are unable, therefore, to say that in the alleged misconduct of the prosecuting officers there is sufficient ground for reversing the proceedings below.
Another ground for the motion was newly-discovered evidence. There are some two or three affidavits filed as to the mental and physical condition of the woman. Those were upon the question of misconduct. After that there were filed four affidavits, two of them relating to the same subject and two others on the question of newly-discovered evidence. Now these affidavits as to newly-discovered evidence amounts simply to this: A witness testifies that he or she had known Shreeve for some time, and he had never said that he knew anything about this transaction. That does not contradict him at all, because he testified in chief that he purposely suppressed the fact of his knowledge, because he did not wish to be called as a witness as his mother had exacted from him a promise before her death that he would not have anything to do with it. Counsel had full benefit of that fact in the argument of the case before the jury. The new evidence does not contradict Shreeve in any particular. Another affidavit is to the effect that the affiant had known Shreeve for some time, and that on one occasion, in a general conversation about this case, Shreeve had said that it was hard to say whether Hattie Cross killed herself or was murdered. The very next sentence in the affidavit destroys the whole effect of that, because it states that he did not speak from the standpoint of personal knowledge-, that is, he did not profess to say it from personal knowledge, but he simply said, as we may suppose, in reference to public reports of the testimony, that it was hard to tell whether she killed herself or was shot. The effect of this was really to destroy the whole effect of the first statement. But the conclusive objection to all this is that these affidavits only go to affect the credit of the witness. Now, the rule is very well settled that a new trial will not be granted for newly-discovered evidence which simply goes to the credit of one of the witnesses.. This is discussed in 3d Graham and Waterman on New Trials at great length.
*391 The last ground upon which the motion is based is the disqualification of one of the jurors, one Boteler. The alleged ground of disqualification is, that he was a non-resident of the District and a resident of Maryland. A paper was filed by Boteler himself on that subject, in which he states that he is twenty-seven years of age; “That he was born and raised in the State of Maryland, and lived there- until about September, 1889, when he left his father’s home in Prince George’s County and came to the City of Washington to obtain employment, and soon after the first of October, 1889, he was employed by the Phaeton Herdic Company of the City of Washington, District of Columbia, and remained continuously in the employ of that company until about the first day of April, 1890, when he left said Herdic Company, and was employed by the Columbia Street Railway Company of the City of Washington and District of Columbia, and has been in the employ of said last mentioned Company continuously since that and is still in the employ of that Company, and expects to remain with it indefinitely; that since he came to the City of Washington be has resided here continuously, boarding here and having his washing done here and making only occasional visits to his father’s home in Maryland, say once in two or three months, and remaining there not longer than one day at any one time; that on the 29th day of October, 1890, he was married in this city to a resident of this city and District of Columbia, and soon thereafter, about the first of April, 1891, commenced keeping house at No. 1233 I street, northeast, in this city, which has been his home ever since, and still is his home; that subsequent to his marriage, and before he commenced keeping house, he resided with the family of his father-in-law in this city, and that when he left his father’s home in Maryland, he came to this City and District with the intention of obtaining employment and remaining here indefinitely, as long as he could find employment to suit him; that he has never had any intention, and has no intention now, of abandoning his residence here and returning to Maryland; that long before he was drawn as a juror for the June *392 term, 1891., of tlie said court, he had formed the intention of becoming and remaining a resident of the said City and District, and that he has never changed his intention, and that at the time when his service as such juror commenced, and before, he deemed himself a bona fide resident of said City and District, and still does; that, as a matter of fact,, he voted in the State of Maryland at the election held in November, 1890; that since that time he has claimed no residence in the State of Maryland and does not now, nor has he, as he believes, any right now so to do.”
The statute requires that at least two days before the trial the defendant shall be served with a list of the jurors for the purpose of enabling him to inquire into their qualifications; so that as a matter of fact the prisoner always has notice of the jurors who are expected to serve, and when the jurors are called he has a right to interrogate them. If he fails to-exercise that.right, and after the verdict, one of them has been found to be really disqualified, the question has been made how far he can make use of the disqualification as a ground for a new trial. If the disqualification goes to the personal fitness of the juror, he ought to be able to do so, but if it is simply statutory and technical, there are strong authorities for holding that hq ought not to be able to do it. The subject is discussed in Wharton’s Criminal Pleading and Practice, section 846, and there is a strong decision in Georgia on this very question of non-residence. Costly vs. The State, 19 Ga., 614, in which the court say: “And it is well settled both by the authorities of the courts of Great Britain and of this State, that it is too late, after a jury has been sworn, to challenge any of its members, propter defectum, or to move to set aside the verdict on that account.”
It is not necessary however for us to express any definite opinion on the question, because it seems to us that the j uror in question comes fully within the term,' ‘1 resident ’ ’ of this District. The qualification is that the juror shall be a citizen of the United States and a resident of the District of Columbia. A man may be a citizen of a State and retain his political privileges and pay taxes, etc.; but may leave his State, his *393 domicile where he is a citizen, for commercial purposes, and reside for a year or more elsewhere, without losing his rights and privileges, and without acquiring them in his new home, but he is none the less a resident in his new home. A citizen of Maryland, for example, hires a house here for a whole year and perhaps lives here during that year; he certainly is a resident here during that period. He could not be proceeded against here under the attachment proceedings as a nonresident of this city. Many things go to make a party a resident of a place, but it is unnecessary to go at length into this question because we have settled it in another case which is not anything like as strong as this. In the case of United States vs. Nardello, 4 Mackey, 503, it was held that a person who was unmarried and not a householder, who was employed in this City and staid here without any purpose of returning at any particular time to Virginia, where his parents lived, was a resident for the purpose of serving as a juror. The fact that the State allowed the juror to vote does not affect the question of residence at all. We think that under the circumstances he is a resident here and amenable to the responsibilities of a resident, where he is now a householder and the head of a family.
The last subject that was discussed in argument as a ground for a new trial, was that the evidence was insufficient to support the verdict and the verdict was against the weight of the evidence. We presume that the same argument was addressed to the trial jury and again to the trial justice on a motion for a new trial. If the evidence submitted on the part of the United States to the jury was true, no question could be raised about its being sufficient. It was clearly proven by several witnesses that the defendant made threats against the life of his wife only a few minutes or so before she was injured, and although not so clearly proved, there was evidence tending to prove that another witness heard similar threats while the defendant was on his way to the place of the shooting, and finally an eye witness saw him shoot her at the place. He had heard the same threats, and he turned and saw the shot fired. It is hardly necessary to repeat what we *394 have said so often, that we are at a disadvantage in going over written evidence. The court below could see the demeanor of the witnesses in giving their evidence, and of course that is lost when we come to examine the case in this court. We have nothing to see except the cold statement of the witnesses. Of course a case may.occur where a court has no difficulty at all in saying that the evidence is not satisfactory, or is overcome on the one side by the contradictory testimony on the other. The statement of a witness may be marked by such inconsistencies that no person, whether a judge or otherwise, could believe it; and so the evidence on one side may be so' overcome by the testimony of other witnesses' who have the same appearance of credibility and truthfulness that the court may readily decide the matter upon such evidence. In this case, for example, if there had been two or three witnesses nearer to the place at the time of this occurrence than the particular witness who claims to have been an eye witness, who had, perhaps, heard the same threats made, but had heard the woman say she would kill herself, and had seen her draw the pistol and shoot herself, and, instead of the arm of the defendant being raised for the purpose of shooting, could swear that his arm was raised to prevent his wife from shooting herself, a court would have very little hesitation in saying that a verdict of guilty, founded on such testimony, should be set aside. But that is a very different case from the one under consideration. ■Shreeve was the first important witness for the Government. There was no proof showing why he should come here from Chicago to swear away the life of this defendant, with whom it appears that he was not even acquainted. Certainly there was no enmity between them. There was no evidence offered to impeach his veracity. He is not contradicted in anything material. His evidence is assailed because it varies from other accounts of the transaction in trifling details about which it would be morally impossible to find half a dozen witnesses to agree. For example, he says that he was going towards the station where he intended to mail a letter, and his attention was attracted to these two people by the threat *395 that he heard. He passed not very far from four young men who were sitting on the steps of a coffee mill, and on his ■cross-examination he says that he did not observe them, and those young men, occupied probably with their conversation, testified that they did not observe him. From that it was argued that he was not there at all ht the time of the shooting. He says again that he struck and lit two matches and looked at the woman. One of .the young men does not remember that anybody lighted a match; one remembers some one lighting one match and another witness comes forward and testifies that he lighted a match, and all this is relied npon as further evidence that Shreeve was not there. It will be seen that most of the evidence offered for the defense is of this character, inconclusive, and insufficient to overcome the ■direct testimony of the witness Shreeve.
A somewhat elaborate argument is founded upon a great many slight and inconclusive circumstances as to the improbability of the statements of the witnesses referred.to. It is claimed the woman herself had made threats against her own life; she had said that if things did not suit her that she would kill herself. It is argued that all these things indicate the probability that she really took her own life in a fit of jealousy. The argument however takes no notice of the other probability that the defendant, from the fact that his wife was following him, in a fit of jealous passion, was naturally wrought up into a state of anger which impelled him to do the very thing that he is charged with doing. We can well understand that. The argument formed on probabilities is not sufficient to over-bear the direct testimony offered on behalf of the Government.

On the whole case we think the judgment should be affirmed.