UNITED STATES of America,

v.

LAUB BAKING CO. et al.
No. CR 67–415.

United States District Court
N. D. Ohio, E. D.
April 4, 1968.

Merle M. McCurdy, U. S. Atty., Carl L. Steinhouse, Atty., Antitrust Div., Cleveland, Ohio, for United States.

Richard J. Cusick, Jr., Cleveland, Ohio, for Laub Baking Co. and Maurice B. Beyer.

Edward C. Crouch, Walter A. Bates, Cleveland, Ohio, William I. Goldberg, Chicago, Ill., for American Bakeries Co.

John H. Schafer, Gerald P. Norton, Washington, D. C., A. C. Davis, Rye, N. Y., for Continental Baking Co. and Russell L. Eberwine.

Tom Ford, Cleveland, Ohio, for Alfred Nickles Baking, Inc. and Malcomb J. MacNab.

David L. Foster, Cleveland, Ohio, Charles E. Hopfl, New York City, for Ward Foods, Inc.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This is a criminal antitrust prosecution against certain baking companies and against a number of individuals, who are officers or employees of these companies. Certain of the individual defendants have moved this court for a protective order relieving them from being photographed and fingerprinted by the United States

Marshal in connection with these criminal proceedings.[1]

Defendants raise four major objections to the taking of their fingerprints. They contend:

1. The United States Marshal has no authority to fingerprint *any* person charged with a Federal misdemeanor in Ohio.

2. Fingerprinting these Defendants would violate their constitutional right against self-incrimination.

3. Fingerprinting these Defendants would constitute an unreasonable search and seizure.

4. Fingerprinting these Defendants would invade their constitutionally protected right of privacy.

These claims raise basic questions as to the legality and constitutionality of long-standing and, heretofore, widely-accepted practices of the United States Marshals. They also present important issues of individual rights and liberties.

The Court has made an extensive examination of the cases in this area. It appears that the issues presented here are, for the most part, matters of first impression in this Judicial Circuit. Indeed, the Court has been unable to find any authorities which directly determine the issues presented here. Because of the lack of precedent relating to these claims, because of the substantial constitutional issues presented, and in view of the long-accepted powers being challenged, the Court feels that a detailed analysis of the issues involved here is required.

The Court will first consider the question of the authority and powers of the United States Marshal and will then proceed to a discussion of the constitutional claims.

### I.

Defendants contend that the United States Marshal has no authority, by statute or otherwise, to fingerprint *anyone* charged with committing a Federal misdemeanor in the state of Ohio.

To support this position, Defendants rely upon a federal statute, Title 28, U.S.C.A. § 570. It reads:

"A United States Marshal and his deputies, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof."

Defendants then refer to Section 109.-51 et seq., *Ohio Revised Code*. This provision authorizes the creation of the Ohio Bureau of Criminal Identification and Investigation. It requires the sheriffs and the chiefs of police in Ohio to fingerprint all persons arrested for the commission of a felony, for suspicion of a felony, and in certain other cases, and to furnish these fingerprints to the Bureau.

Counsel for the Defendants, combining these two provisions, contend that a United States Marshal can exercise only the powers which a sheriff operating in the same geographic area could exercise. They assert that Section 109.51 et seq., Ohio Revised Code, is the source of an Ohio sheriff's power to fingerprint, and that it gives the sheriffs power to fingerprint only persons arrested for felonies. This grant of power, according to Defendants, does not extend to persons charged with misdemeanors.

Defendants are accused of violating the Sherman Act, Title 15, U.S.C.A. § 1. Since the penalty for violation of this section is imprisonment not exceeding one year, the Federal system classifies this crime as a misdemeanor. Title 18, U.S.C.A. § 1.

1. Although the motion seeks an order relieving the Defendants from being fingerprinted and photographed by the United States Marshal, the Court, for purposes of brevity, will refer to the motion only as relating to fingerprinting. The Court sees no important factual distinctions between fingerprinting and photographing, and any legal considerations applicable to fingerprinting will be equally applicable to photographing.

There is no question that the Defendants are accused of committing a Federal misdemeanor. There is, however, great question with respect to the rest of the Defendants' analysis. The Court has concluded, for a number of reasons, that under Ohio law a sheriff has the power to fingerprint persons charged with misdemeanors.

■ Section 109.51 et seq., Ohio Revised Code, does not, as claimed by the Defendants, limit the power of sheriffs to the fingerprinting of arrested felons. Section 109.60, the section enumerating the instances in which sheriffs are required to fingerprint persons and to forward these prints to the Bureau, provides:

"This section does not apply to a violator of a city ordinance or a person arrested for a misdemeanor * * * unless it is advisable for the purpose of subsequent identification."

Under the interpretation the Ohio authorities give to this section, it is within the discretion of the sheriff to determine when it is "advisable" to fingerprint misdemeanants and enter their fingerprints in the central file. 1925 O. A.G. 176 (No. 2328). So, even if we accept Defendants' claim that Section 109.51 et seq., Ohio Revised Code, is the source of the sheriff's power to fingerprint persons, it is apparent that the section leaves the fingerprinting of misdemeanants to the discretion of the sheriff. And by virtue of Title 28, U.S.C.A. § 570, supra, this discretionary power is conferred upon the United States Marshal. On this ground alone, the United States Marshal has the authority, in the exercise of his discretion, to fingerprint the Defendants in this case.

There are, in addition, other grounds for this conclusion. The authority of the sheriff under Ohio law to fingerprint persons is not based solely on the provisions of Section 109.51 et seq. The power derives from another source.

There are two provisions in the Ohio statutes which define the general powers of the sheriff:

"Section 311.08. The sheriff shall * * * exercise the powers conferred and perform the duties enjoined upon him by statute and by the common law."

"Section 311.07. [The] sheriff shall preserve the public peace * * *."

■ These statutory provisions are the two main sources of the power of a sheriff under the law of Ohio. An Ohio sheriff has the common law powers possessed by sheriffs, and he has the general duty to preserve the public peace. There is implied in the delegation of this duty a grant of the power necessary to perform and accomplish it. Cf. 1925 O. A.G. 176 (No. 2328).

The common law powers of a sheriff in Ohio have been defined. It is the duty of the sheriff " * * * to preserve the peace in his bailiwick or county. To this end he is the first man within the county, and it is incident to his office that he apprehend and commit to prison all persons who break or attempt to break the peace. He is bound, *ex officio,* to pursue and take all traitors, murderers, felons, and rioters. He has the safekeeping of the county jail, and must defend it against all rioters; and for this, as well as for any other purpose, in the execution of his duties, he may command the inhabitants of the county to assist him, which is called the *'posse comitatus'.*" State ex rel. Attorney General v. Ganson 58 Ohio St. 313 at 320, 50 N.E. 907 at 908 (1898).

As a public officer charged with preserving the peace, the sheriff has additional implied powers under Ohio law. He possesses the authority to engage in activities which are reasonably necessary for the due and efficient exercise of the powers expressly granted to him. State ex rel. Kautzman v. Graves, 91 Ohio St. 113, 110 N.E. 185; aff'd State of Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172, State ex rel. Copeland v. State Medical Board, 107 Ohio St. 20 (1923); State v. Carter, 67 Ohio St. 422 (1903).

The power to fingerprint for identification persons charged with crimes is

reasonably necessary for the preservation of the peace and the prevention of crime. It enables the officers to identify the accused to determine whether he is actually the person who committed the crime. It facilitates positive identification of persons who have escaped. It is invaluable in determining whether the accused has committed previous crimes, or is wanted in other jurisdictions.

In recognition of the fact that fingerprinting is a necessary incident of crime detection and prevention, almost all the early cases on the subject recognized that peace officers possess a common law power to fingerprint for identification, even in the absence of statute. Downs v. Swann, 111 Md. 53, 73 A. 653; State ex rel. Bruns v. Clausmeier, 154 Ind. 599, 57 N.E. 541; Mabry v. Kettering, 92 Ark. 81, 122 S.W. 115; Shaffer v. United States, 24 App.D.C. 417 (C.A.D.C.1904) cert. denied 196 U.S. 639, 25 S.Ct. 795, 49 L.Ed. 631; Bartletta v. McFeeley, 107 N.J.Eq. 141, 152 A. 17; People v. Swallow, 100 Misc. 447, 165 N.Y.S. 915; United States v. Cross, 9 Mackey 365 (20 D.C. 365) at p. 382; United States v. Kelly, 55 F.2d 67, 83 A.L.R. 122 (2d Cir. 1932). A common law power to fingerprint persons is recognized in Ohio. See 1929 O.A.G. 749.

The power to fingerprint for identification is reasonably incidental to the preservation of the peace and the prevention of crime. Sheriffs in Ohio, therefore, have a common law power to fingerprint persons who have been lawfully arrested or formally charged with a crime.

Since sheriffs have this power under Ohio law, Title 28, U.S.C.A. § 570, confers the power upon the United States Marshals performing their duties in Ohio. The United States Marshal, then, has the power, referable to state law, to fingerprint these Defendants.

There is, in addition, one further ground for the Court's conclusion that the United States Marshal has the authority to fingerprint these Defendants. Even if the United States Marshal did not possess this authority by virtue of state law (and Section 570), he would possess this authority by virtue of Federal law.

The cases which have considered the extent of the power of the United States Marshals have recognized an area of power implied as a matter of Federal law. Federal officers, like state officers, have the implied power to do those acts reasonably necessary to carry out the duties imposed upon them and for the due and efficient exercise of the powers expressly granted to them. United States v. Jones, 204 F.2d 745 (7th Cir. 1953) cert. denied 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368. United States v. Kelly, 55 F.2d 67, 83 A.L.R. 122 (2nd Cir. 1932) recognized a common law power in the United States Marshal to fingerprint persons charged with Federal crimes, including misdemeanors.

More recently, United States v. Krapf, 285 F.2d 647 (3rd Cir. 1961) recognized an implied power to fingerprint persons charged with Federal misdemeanors. It noted that the United States Marshal is a sort of "national peace-officer" and is vested with the executive power necessary to perform his duties.

The *Krapf* case went one step further in stating that Title 28, U.S.C.A. § 570 does not limit the power of the United States Marshal to the powers exercised by a sheriff under the applicable state law. It read Section 570 as supplementing the implied powers of the United States Marshal and not as limiting them.

The Court agrees with the results reached in both the *Kelly* and the *Krapf* cases. As a matter of Federal law, Federal officers have the implied power to perform those activities reasonably incidental to the effectuation of the duties imposed upon them by law. It would be absurd to read Title 28, U.S.C.A. § 570 as limiting the power of the United States Marshal in this respect, especially since Congress has elsewhere seen fit to enumerate certain of the other powers of the United States Marshal. See Title 18, U.S.C.A. § 3053. The Court

holds, therefore, that, as a matter of Federal law, the United States Marshal has an implied power to perform activities reasonably incidental to those duties expressly imposed upon him. This power exists apart from those conferred upon him by virtue of Title 28, U.S.C.A. § 570 and includes the power to fingerprint persons validly arrested for a Federal crime or formally charged with a Federal crime.

The Court is, therefore, of the opinion that there are three sources of the United States Marshal's power to fingerprint the Defendants in this case:

1. The power to fingerprint misdemeanants exists by virtue of Section 109.-60 et seq., Ohio Revised Code.

2. The power exists as an implied power of sheriffs under Ohio law and is conferred upon the United States Marshal by virtue of Title 28, U.S.C.A. § 570.

3. The power exists by implication as a matter of Federal law from the powers and duties expressly conferred upon the United States Marshal by Congress.[2]

## II

Having determined that the United States Marshal has the power to engage in the practice of fingerprinting persons accused of committing misdemeanors under Federal law, the Court will now proceed to an examination of the constitutional claims of the Defendants.

■ Defendants submit that fingerprinting violates their right against self-incrimination guaranteed by the Fifth Amendment. This claim is plainly without substance.

The Supreme Court has stated, in Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1967):

" * * * [T]he privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature * * *." 384 U.S. at 761, 86 S.Ct. at 1830.

The Court, in Schmerber, went on to state that the Fifth Amendment " * * * offers no protection against compulsion to submit to fingerprinting, photographing, or measurements * * *. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." 384 U.S. at 764, 86 S.Ct. at 1832.

Any evidence secured from these Defendants as a result of their being fingerprinted would not be evidence of a communicative nature. Fingerprinting does not, therefore, violate any right of these Defendants against self-incrimination. See Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966).

## III

Defendants' second constitutional objection to being fingerprinted is their claim that fingerprinting involves an illegal search and seizure under the Fourth Amendment.

It is questionable whether in this Judicial Circuit fingerprinting can constitute a search and seizure under any circumstances. Recently, the United States Court of Appeals for the Sixth Circuit decided United States v. Richardson, 6 Cir., 388 F.2d 842 (1968). In that case

2. The discussion in Section I of this opinion relates only to the powers of the Ohio sheriff and the United States Marshal to fingerprint persons as a question of statutory or common law authority. These powers, like any other powers of peace officers, e. g., the powers to search, arrest and interrogate, may be qualified when they come into conflict with the constitutionally protected rights of the individual. Therefore, what has been said in Section I of this opinion should not be read as a blanket authority to fingerprint all persons in all cases, but rather as deciding the issue of whether there is a statutory or common law authority to engage in the practice of fingerprinting persons.

the officers examined the defendant's hands under an ultraviolet light for evidence of the presence of a fluorescent powder. The Court determined that this procedure did not constitute a search of the defendant.

The purpose of the examination of the defendant's hands in the *Richardson* case was the discovery of evidence which might incriminate him. If this procedure does not constitute a search, it is doubtful that fingerprinting a defendant would be determined to be a search. While fingerprinting may often have the discovery of evidence as its primary objective, it will also invariably have another purpose. That purpose is the positive identification of the defendant. If an examination of the hands of an accused to secure evidence is *not* a search, it is difficult to believe that the recording of his fingerprints merely for identification is a search. It appears doubtful, then, that fingerprinting would constitute a search in the view of the United States Court of Appeals for the Sixth Circuit.

The Court does not rest its decision upon this ground alone, however. For there are other cases that intimate that fingerprinting may constitute a search and seizure. United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955), cert. denied 350 U.S. 966, 76 S.Ct. 435, 100 L.Ed. 839, held that fingerprints taken subsequent to a valid arrest do not constitute an illegal search and seizure. This implies that fingerprinting subsequent to an *unlawful* arrest or *prior* to arrest *would* constitute an illegal search and seizure. Other cases contain the same implication. See Smith v. United States, 117 U.S.App. D.C. 1, 324 F.2d 879 (1963); Napolitano v. United States, 340 F.2d 313 (1st Cir. 1965). All these cases held that fingerprinting subsequent to a lawful arrest did not constitute a violation of the Fourth Amendment. They imply, however, that fingerprinting subsequent to an unlawful arrest or prior to a valid arrest would infringe on Fourth Amendment rights. Implicit in this inference

is the assumption that fingerprinting *does* constitute a search.

Fingerprinting as a police procedure is, in a sense, *sui generis*. It has a number of distinct purposes not characteristic of other police procedures, which have been considered by the courts in relation to the various constitutional guaranties.

The primary purpose of fingerprinting is the positive identification of the accused. Indeed, fingerprinting is one of the most reliable forms of identification known at the present time. Positive identification is necessary not only to determine who the accused actually is, but also to insure against the possibility that he will flee from prosecution for the alleged offense. There are, then, two periods in which identification is important. It is important in the present to identify the accused and to determine the presence or absence of a prior record. And it is important for future identification, in the event of flight from prosecution or in the event of subsequent offenses.

Another purpose of fingerprinting may appear in certain cases. This is an evidentiary purpose—for example, to compare the fingerprints of the defendant with fingerprints left at the scene of the crime.

The evidentiary purpose may or may not be present in a given case. The identification purposes are normally present. And it is to effectuate these identification purposes that fingerprinting is normally undertaken.

From the above, it is readily apparent that the fingerprinting process is very different from what we normally think of as a search. Searches are conducted to effectuate an evidentiary purpose, while fingerprinting normally is performed primarily for identification.

As a result of these differences, few of the usual characteristics of a search are present in the fingerprinting process. And many of the terms and principles applied to searches are inappropriate to fingerprinting. For example, in the absence of what was referred to above as

the "evidentiary purpose," fingerprinting does not involve "an examination of one's * * * person with a view to the discovery of * * * evidence of guilt to be used in the prosecution of a criminal action." United States v. Blackburn, 389 F.2d 93 (6th Cir. 1968). Neither does it involve a "seizure of evidence." Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (dissent). The exclusion remedy characteristic of search and seizure cases also seems hardly appropriate, where the fingerprints are used solely for identification purposes and not as evidence. Berger v. State of New York, supra, 18 L.Ed.2d at 1079. And the search warrant, peculiarly an incident of search and seizure law, would seem out of place in obtaining the fingerprints of an accused.

There is a legitimate governmental interest in knowing for an absolute certainty the identity of the person charged with the crime. The Government also has an interest in knowing whether the accused is wanted in other jurisdictions, and in ensuring his identification in the event he flees prosecution. To satisfy these interests, the Government routinely takes the fingerprints of the accused.

Does this activity, performed for a non-search purpose, constitute a search of the accused?[3] A number of courts have considered analogous police procedures, performed for "non-search" purposes, against challenges under the Fourth Amendment. In each case the police activity performed to effectuate a purpose other than that of securing evidence had resulted in the discovery of incriminating evidence.

United States v. Blackburn, 389 F.2d 93 (6th Cir. 1968) involved a procedure utilized by the police in cases where the person they arrested was a resident of a hotel. In order to protect the personal effects of the accused, the police would collect these effects and store them for safekeeping. In the instance involved in the Blackburn decision, the police had discovered evidence relevant to the criminal proceeding, when they collected the defendant's personal effects. The Court held that this police procedure did not constitute a search, since it was not an exploratory investigation for the purpose of discovering evidence.

United States v. Graham, 391 F.2d 439 (6th Cir. 1968) involved a different sort of police procedure. In that case the police had impounded the car in which the defendants were riding at the time of their arrest. For purposes of identifying the car for their records, the police opened a door and examined the serial number. From the serial number they ascertained that the car had been stolen. The Court in Graham held that the examination for purposes of identifying and impounding the car was not a search within the meaning of the Fourth Amendment.

In a very recent case, the United States Supreme Court considered a procedure similar to the one involved in the Graham case. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (decided March 5, 1968) involved a police regulation relating to the impounding of vehicles belonging to arrested persons. The regulation required an officer to examine the vehicle thoroughly and to remove all valuables from it. After the defendant's arrest in the Harris case, an officer examined the car for the purposes of removing any valuables. In doing so, he discovered evidence incriminating the accused. The Court held that this was not a search, since the police were engaged in the performance of their duty to protect the contents of the car and were not engaged in a search of the car for evidence.

---

3. As noted above, the normal purpose of fingerprinting an accused is identification. In some instances, fingerprinting will also lead to evidence relevant to the prosecution. While this latter purpose which is actually a search for evidence, may exist in such instances, it can hardly render the fingerprinting in such cases invalid. Fingerprinting even in these instances, will still have a "non-search" purpose, i. e., identification which justifies the activity.

■ These cases indicate that reasonable police procedures, performed to effectuate a governmental interest other than the discovery of incriminating evidence, do not constitute a search within the meaning of the Fourth Amendment. And they do not become a search merely because in the course of these activities, evidence is discovered.

■ There is a valid governmental interest in the positive identification of a person arrested for or charged with a crime. Law enforcement authorities may be called upon to identify the accused at a future date. Fingerprinting is a reasonable method of securing this identification. Since it is justifiable as an identification procedure, it is not invalid as a search.

Prior to arrest or charge, however, the legitimate identification purpose may not be present. In these instances, fingerprinting might only be justified as an attempt to secure evidence. A number of courts have indicated that, in such circumstances, it is subject to the usual protections against searches provided by the Fourth Amendment. See United States v. Iacullo, supra; Smith v. United States, supra; Napolitano v. United States, supra.[4]

■ The cases cited above all involved persons *arrested* for crimes and fingerprints which were taken subsequent to arrest. In the present case, the Defendants have been charged but not arrested. They have appeared in response to a summons. The Court can see no ground for distinguishing between persons arrested and charged with crimes, and persons who are summoned to answer to a charge of crime. The method used to obtain the presence of an accused in court is a matter within the discretion of the United States Attorney. Rule 4, Federal Rules of Criminal Procedure. The decision of the United States Attorney as to the method of prosecution can hardly be held to confer any rights upon the accused. Indeed, if the Court were to distinguish between arrested persons and summoned persons, permitting the fingerprinting only of those persons arrested, the Government would be inclined to arrest more persons in order to be certain of obtaining their fingerprints as insurance against the possibility of flight. Although most of the cases cited above concern persons arrested and in lawful custody at the time the identifying procedure took place,[5] the Court sees little difference between arrested and summoned persons in this respect. Each may be required to submit to reasonable fingerprinting procedures based on a valid governmental interest in ensuring their presence and future identification. See Napolitano v. United States, supra.

■ Fingerprinting of persons validly arrested or formally charged with a crime does not constitute a search and seizure within the meaning of the Fourth Amendment.

### IV

Defendants' final contention is that fingerprinting would, under the circumstances present here, constitute a violation of their "right of privacy." In this connection they rely primarily upon Griswold v. State of Conn., 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Counsel for Defendants assert that none of the circumstances normally used to justify fingerprinting are present in this case. They maintain that there is little risk that any of the Defendants will flee to avoid prosecution. As evidence of this, they point out that the Defendants are all substantial members of the community, and note that they all responded to a summons in this case and are now

---

4. The present case does not involve a situation in which fingerprints are taken prior to arrest or charge. The Court, therefore, expresses no opinion as to the permissibility under the Fourth Amendment of fingerprinting during that period.

5. Napolitano v. United States involved a defendant whose fingerprints were taken after he was admitted to bail.

free on personal bonds. They assert that there is no problem here of identifying the Defendants, or of determining whether they are wanted for other crimes, or of determining whether they have committed prior crimes relevant to the prosecution for this offense.

Counsel for the Defendants, relying on these factual assertions, contend that none of the usual justifications for fingerprinting exist here. Therefore, they argue, fingerprinting here is unjustified and constitutes an arbitrary invasion of the persons of the Defendants. And this arbitrary invasion violates the constitutional "right of privacy" recognized in Griswold v. State of Conn., supra.

■ The Court cannot accept the position that no justification for fingerprinting exists in this case. While the Court agrees it is very unlikely that these Defendants are wanted for other crimes or that they have committed other offenses relevant here, the Court may not accept the unsupported assertion of counsel that, as a matter of fact, this is the case. This fact could only be determined conclusively by fingerprint comparison. While it is unlikely that fingerprinting here will uncover such facts, we cannot say that such a discovery is *impossible* without the actual fingerprints. Since the discovery is not impossible, the Court cannot say that fingerprinting here is without any justification or purpose. A valid purpose exists and, therefore, fingerprinting here is not an arbitrary invasion of the persons of the Defendants.

■ For these same reasons, the Court cannot accept the assertion that fingerprinting is rendered unnecessary because the Defendants will not flee. Whether any of these Defendants will flee or not is a fact which no one at the present time can know. It is, in a sense, a future fact. We can estimate the probability of flight—and here it is a low probability—but no one at this time can say for certain that it will not occur. And since flight is not an impossibility here, the Court cannot say that finger-

printing, as insurance of future identification, is unjustified or arbitrary.

The position of Defendants must be rejected for another reason. If the Court were to accept the position advanced by the Defendants, the effect would be to eliminate the present system of fingerprinting all persons charged with crimes and to substitute another system. Under the new system, the judge would determine on a case-by-case basis whether fingerprinting was necessary and, therefore, permissible. The problem with such a system is that it would require the judge to make this determination on the basis of facts upon which he could only speculate. He could not know for certain if the defendant was wanted for other offenses until the defendant had been fingerprinted. And he could not know in advance if the defendant would flee. In every case there would be some possibility that each of these would, in fact, be the case, so there would almost invariably be justification for fingerprinting. The Court sees no reason to create such a useless and thoroughly unworkable system, merely to save perhaps a handful of persons the slight imposition of being fingerprinted.

For the reasons noted above, the Court concludes that fingerprinting is neither arbitrary nor unjustified in this case.

We must now consider if fingerprinting these Defendants will infringe upon their "right of privacy," as recognized in the *Griswold* case.

In examining this claim of Defendants, it is important to bear in mind the findings, outlined above, that there are legitimate governmental interests which will be effectuated by fingerprinting in this case. The question, then, is whether this imposition and interference with the person of the Defendants, pursuant to a legitimate governmental interest, constitutes an invasion of the right of privacy of the Defendants.

Griswold v. State of Conn., supra, involved the challenge of a state law prohibiting the use of contraceptives. A majority of the Supreme Court held the

statute unconstitutional, although the several opinions advanced different reasons for so holding. The majority opinion, written by Mr. Justice Douglas, stated that the rights enumerated in the first ten amendments have "penumbras, formed by emanations from those guarantees that help give them life and substance." These create "zones of privacy." The Court went on to conclude that the marital relationship was included within these "zones of privacy," although it did not state into which particular zone it fell. See J. F. Kelley, "The Uncertain Renaissance of the Ninth Amendment," 33 U.Chi.L.Rev. 814 (1966).

Mr. Justice Goldberg, concurring in the other major opinion, stated that the "right of marital privacy" was a "fundamental right," which he defined as one "so rooted in the traditions and conscience of our people as to be ranked as fundamental." These fundamental rights, he wrote, are protected by the rule of construction embodied in the Ninth Amendment, which provides that the enumeration of certain rights in the Constitution "shall not be construed to deny or disparage others retained by the people."

The *Griswold* decision is a relatively recent one, and there has been little elaboration of the legal conclusions presented there. It appears, however, that the Court in *Griswold* regarded the marital sexual relationship as a somewhat special situation. This relationship is private by nature. And it is so basic and important to our society that it would be inconceivable that it is not protected from unwarranted interference. It is an essentially private area. And it is an area so commonly recognized as private that it would be a natural subject of constitutional protection.

The cases most nearly in point apply this interpretation of the *Griswold* decision. Travers v. Paton, 261 F.Supp. 110 (D.C.Conn.1966), concludes that *Griswold* involved "the special nature of the marriage bond," and a right of marital privacy which was recognized as a "fundamental right." Davis v. Firment, 269 F.Supp. 524 (E.D.La.1967) also construed the *Griswold* case as protecting only "fundamental rights." The *Davis* court concluded that the right to wear one's hair in an unusual manner at school was not such a "fundamental" right.

In the present case, we are concerned with a governmental interference with the person of the Defendants for identification purposes. The interference is relatively slight, although to some degree offensive, and is in pursuance of a reasonable and legitimate governmental interest. The interference is not arbitrary, since the Government has this reasonable purpose of securing positive identification of the accused.

Does the interference outlined above infringe upon any "fundamental right of privacy" of these Defendants?

The "rights" involved in this case bear little resemblance to those protected in *Griswold*. In *Griswold*, the right of marital privacy was regarded as one basic to our conception of society. It was an area traditionally regarded as private. It was an area in which privacy was particularly important. It was an area seldom interfered with by Government. It was an area in which the Government had little legitimate interest.

These factors are not present here. Here the Government does have a legitimate interest. And it utilizes a procedure which the courts have recognized. United States v. Kalish, 271 F.Supp. 968 (D.C.Puerto Rico 1967); Smith v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963); United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955); McGovern v. Van Riper, 140 N.J.Eq. 341, 54 A.2d 469 (1947); State ex rel. Mavity v. Tyndall, 224 Ind. 364, 66 N.E.2d 755 (1946), approved on later appeal 225 Ind. 360, 74 N.E.2d 914, app. dism. 333 U.S. 834, 68 S.Ct. 609, 92 L.Ed. 1118, reh. denied 333 U.S. 858, 68 S.Ct. 732, 92 L.Ed. 1138.

Moreover, this is not an area traditionally regarded as private. The courts have recognized procedures which involved minor interferences, for purposes of iden-

tification, with the person of individuals charged with crimes. These cases upheld reasonable identification procedures against claims of violation of the Fifth Amendment. See, e. g., Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (requiring prisoner to try on blouse); Rigney v. Hendrick, 355 F.2d 710 (3rd Cir. 1965) (requiring accused to submit to lineup); Copeland v. United States, 120 U.S.App.D.C. 5, 343 F.2d 287 (1964) (same); Caldwell v. United States, 388 F.2d 385 (8th Cir. 1964) (same); Kennedy v. United States, 122 U.S.App.D.C. 291, 353 F.2d 462 (1965) (requiring accused to speak for voice identification); Smith v. United States, supra (fingerprints and palm-prints); McFarland v. United States, 80 U.S.App. D.C. 196, 150 F.2d 593 (1945) (examination of defendant's body for traces of blood); Leeper v. State of Texas, 139 U.S. 462, 11 S.Ct. 577, 35 L.Ed. 225 (1891) (examination of body for marks and bruises); Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966) (defendant may be required to remove items of clothing or assume poses). The important thing to note is that the above cases recognize the existence and permissibility of these procedures, which all involve minor interferences with the person of the accused for identification or evidentiary purposes. They demonstrate that there is no long-standing traditional "right of privacy" of a defendant to be immune from identification. "The Constitution confers no right on an accused to be immune from the eyes of his accusers. * * *" Kennedy v. United States, 122 U.S.App.D.C. 291, 353 F.2d 462 (1965) at 466. See, United States v. Quarles, 387 F.2d 551 (4th Cir. 1967).

This is not an area traditionally regarded as private in nature. United States v. Kelly, 55 F.2d 67 (2nd Cir. 1932). It does not involve procedures or intrusions which "shock the conscience" or "offend a sense of justice." Rochin v. People of State of Calif., 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The intrusion is not one which is "not justified in the circumstances"; and it is not "made in an improper manner." Schmerber v. State of Calif., 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1967). And it is made pursuant to a reasonable purpose relating to law enforcement, i. e., identification of the accused. United States v. Kalish, supra.

In these circumstances, the Court finds that fingerprinting does not violate the "right of privacy" of persons arrested for or charged with a crime. The motion of Defendants for a protective order with respect to their being fingerprinted and photographed by the United States Marshal is, therefore, overruled.

It is ordered that the Defendants appear in this Courthouse before the United States Marshal on or before April 15, 1968, to be fingerprinted and photographed.