# Authority of FBI Agents, Serving As Special Deputy United States Marshals, to Pursue Non-Federal Fugitives

Regardless of whether federal process is outstanding or anticipated, agents of the Federal Bureau of Investigation have authority to investigate fugitive felons when there is a reasonable basis to believe that doing so will detect or prevent the commission of a federal crime.

U.S. Marshals, including FBI agents serving as Special Deputy U.S. Marshals, have authority under 28 U.S.C. § 566(e)(1)(B) to investigate and pursue fugitives wanted under state felony warrants whenever such action is undertaken pursuant to a special apprehension program approved by the Attorney General.

Where a U.S. Marshal or Special Deputy U.S. Marshal is engaged in an approved investigation of state law fugitives under section 566(e)(1)(B), the marshal's derivative state sheriff powers under 28 U.S.C. § 564 and the marshal's inherent authority to take enforcement actions necessary to carry out his federal duties provide valid grounds for the marshal to arrest such fugitives.

February 21, 1995

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL BUREAU OF INVESTIGATION

## Summary

You have requested our opinion on the authority of agents of the Federal Bureau of Investigation ("FBI"), serving as Special Deputy United States Marshals, to participate in federal-state task force efforts to locate and arrest fugitives charged with violations of state law where federal process is neither outstanding nor anticipated. Our conclusions on this matter may be summarized as follows:

(1) Regardless of whether federal process is outstanding or anticipated, FBI agents have authority to investigate (and sometimes arrest) fugitive felons when there is a reasonable basis to believe that doing so will detect or prevent the commission of a federal crime, including violations of the Fugitive Felons Act, 18 U.S.C. § 1073 ("FFA"). That may include situations where a state fugitive has not yet crossed state lines but has engaged in evasive movements or a course of conduct that manifests an intent to cross a state or national border and violate the FFA.

(2) Under 28 U.S.C. § 566(e)(1)(B), the U.S. Marshals Service ("USMS") has authority to investigate fugitive matters "as directed by the Attorney General." This authority is not confined to fugitives who are sought on federal charges. In a series of special apprehension programs authorized by three Administrations, the Attorneys General have directed the USMS and other federal agen-

33

cies to engage in cooperative operations with state and local police that encompass the investigation, pursuit, and arrest of fugitives wanted under state as well as federal warrants. Section 566(e)(1)(B) authorizes U.S. Marshals (including FBI agents serving as deputy marshals) to investigate and pursue fugitives wanted under state warrants whenever it is done pursuant to a special apprehension program approved by the Attorney General.

(3) Although section 566(e)(1)(B) does not explicitly provide for authority to participate in task force *arrests* in state warrant cases, we conclude that where a U.S. Marshal is engaged in an approved investigation of state law fugitives under that section, arrest authority may be validly based upon (a) the marshal's derivative state sheriff powers granted under 28 U.S.C. § 564; and (b) the marshal's inherent authority to take enforcement actions necessary to carry out his federal duties, which now include participation in cooperative fugitive pursuit operations with state and local police.

(4) However, we conclude that neither the doctrine of legislative ratification nor the U.S. Marshal's asserted "federal common law authority" provide independent, non-statutory legal authority for marshals to pursue or arrest fugitives sought for state law violations only.

## I. BACKGROUND

This matter arises from the operations of intergovernmental fugitive task forces, in which federal law enforcement personnel work with state and local law enforcement agencies in locating and apprehending fugitives from justice. The most prominent of these task forces began in 1981 and were classified as Fugitive Investigative Strike Teams, or "FIST," under a congressionally funded program of the USMS. Similar task force operations have also been authorized by the Attorneys General in more recent years, including Operation Gunsmoke (1992) and Operation Trident (1993). These operations are designed to locate and apprehend both federal and state law fugitives. Although the operations have been successful in arresting both categories of fugitives, arrests of state law fugitives have predominated. The USMS has stated that "[t]he cooperative assistance of state and local officers is essential to the apprehension of federal fugitives under the FIST program and vice versa." [1] Federal personnel assigned to these intergovernmental task forces are sometimes expected to assist not only in locating, but also arresting, the fugitives in question.

---

[1] Memorandum for William Sessions, Director, Federal Bureau of Investigation, from Stanley E. Morris, Director, U S. Marshals Service, Attachment p.2 (Dec. 8, 1987) ("1987 Mem.").

The FBI's fugitive apprehension efforts have generally been based upon the Fugitive Felons Act ("FFA" or "UFAP"), 18 U.S.C. § 1073,[2] which prohibits persons from moving or traveling in interstate commerce in order to avoid prosecution, confinement, or service of process in connection with felonies under the laws of the place from which flight is taken. The Department of Justice has issued procedural standards governing the FBI's exercise of its authority under the FFA, but these standards are not statutory and could be changed by administrative action. FBI agents have clear statutory authority to pursue and arrest both federal and state law fugitives who have violated the FFA by crossing state lines. The more difficult question raised by the FBI arises when the target fugitive has not been charged with any federal crime, has not fled across state lines, and seemingly presents no other independent basis for the exercise of federal law enforcement jurisdiction.

The FBI has considered its own authority to pursue and arrest fugitives to be limited by the parameters of the FFA and by Department procedures governing the routine handling of its general criminal investigations. It now inquires whether deputation of FBI agents as Special Deputy U.S. Marshals will enhance or broaden their authority to pursue and arrest fugitive felons charged only with state law crimes. In its memorandum requesting this opinion, however, the FBI questions whether the authority of the USMS extends that far.

The USMS asserts a broader range of federal authority to investigate and apprehend "non-federal" or "state law" fugitives. It asserts that this authority may be based on a number of sources apart from the FFA: 28 U.S.C. § 564 (marshal's authority to exercise powers of the state sheriff while executing federal law in that state); 28 U.S.C. § 566(e)(1)(B) (marshal's authority to investigate fugitive matters as directed by the Attorney General); and the U.S. Marshal's "inherent" or "federal common law" authority to take such enforcement measures as are necessary to carry out its federal duties. The USMS also asserts that repeated enactment of appropriations earmarked for the fugitive apprehension programs, after Congress had been made well aware that federal officals pursued and arrested large numbers of state law fugitives under those programs, provides sufficient legal authority for such activities under the doctrine of congressional ratification.

Contrary to assertions in the FBI submission, the USMS states that its personnel "do not routinely make state and local arrests on state and local fugitive warrants," as opposed to providing assistance when such arrests are made by a federal-state task force.[3] Nonetheless, it is evident that USMS personnel sometimes perform such arrests in special apprehension program operations, and it is the

---

[2] This statute is also sometimes referred to as the Unlawful Flight to Avoid Prosecution law, or UFAP.

[3] Memorandum for Walter E. Dellinger, Assistant Attorney General, Office of Legal Counsel, from Deborah C Westbrook, General Counsel, U.S. Marshals Service, *Re: Authority of United States Marshals Service to Participate in Joint Federal/State/Local Fugitive Apprehension Task Forces* at 2 (Oct. 7, 1994).

legal basis for such federal arrest activity that the FBI most strongly questions in its submission.

## II. ANALYSIS

### A. *Extent of FBI's Existing Statutory Authority*

Federal law enforcement officials have authority to participate in the investigation and arrest of some fugitives wanted for state law violations under the provisions of the Fugitive Felons Act. *See* 18 U.S.C. § 1073. The FFA makes it a federal crime to "move[] or travel[]" in interstate or foreign commerce" in order to avoid prosecution, custody, confinement, or service of process in connection with felonies under the laws of the state from which the person is fleeing. The purpose and policy underlying the FFA was explained by the court in *Lupino v. United States*, 268 F.2d 799, 801 (8th Cir. 1959):

> [F]lights by perpetrators of crimes against the states are a common means of hindering state justice as is well known and, as it is the federal government which accords the freedom of movement throughout the country that makes the flights possible, it is plainly within the province of that government to regulate this abuse of it.

A threshold issue is whether FBI agents may have dormant authority under the FFA to participate in the investigation or arrest of those "state law" fugitives whose cases may have heretofore been considered outside that statute's coverage. If a more expansive interpretation of existing FFA authority is warranted, the necessity for additional authority to be derived from the USMS through deputation might be reduced.

The FBI submission reflects a somewhat restrictive interpretation of its current authority to investigate and arrest under the FFA. It states, for example, that its fugitive investigation authority is constrained by the preliminary inquiry requirements of the Attorney General's Guidelines on Investigations.[4] On the other hand, it does not explore the FBI's clear statutory authority to make warrantless arrests whenever there are reasonable grounds to believe the person to be arrested is in the process of committing any federal crime, including a violation of the FFA. *See* 18 U.S.C. § 3052.

Where there is a reasonable expectation that an investigation will lead to evidence of a violation of federal law, FBI agents have authority to undertake that investigation under 28 U.S.C. § 533. *See Authority of the Federal Bureau of Inves-*

---

[4] Memorandum for Walter E. Dellinger, Assistant Attorney General, Office of Legal Counsel, from Howard M. Shapiro, General Counsel, FBI, *Re: Authority of FBI Agents Who Have Been Deputized as Special Deputy United States Marshals to Locate and Apprehend State and Local Fugitives* at 2 (Aug. 23, 1994).

*tigation to Investigate Police Killings*, 5 Op. O.L.C. 45, 49 (1981). As this Office also stated in a 1977 opinion on a similar issue: "As long as there remains a legitimate basis for the view that the investigation . . . may unearth violations of federal law, we believe that the FBI is authorized to proceed with the investigation." Memorandum for the Director of the FBI, from Mary C. Lawton, Deputy Assistant Attorney General, *Re: FBI Cooperation with Local Authorities* at 1 (Nov. 9, 1977). This is consistent with the Attorney General's 1989 Guidelines for FBI general crimes investigations, which provide:

> A general crimes investigation may be initiated by the FBI when facts or circumstances *reasonably indicate that a federal crime* has been, *is being, or will be committed.* The investigation may be conducted to prevent, solve, and prosecute such criminal activity.
>
> The standard of "reasonable indication" is substantially lower than probable cause.

The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations § II.C(1) (Mar. 21, 1989) (emphasis added) ("AG Guidelines"). The Guidelines further state that a preliminary inquiry is not a required step "when facts or circumstances reasonably indicating criminal activity are already available; in such cases, a full investigation can be immediately opened." *Id.* § II.B(1). These provisions show that the FBI has ample authority to investigate a state law fugitive whenever there is some reasonable indication that he may violate the FFA or another federal law.[5]

Various courts have held that the crossing of state lines is a necessary element for a violation of the FFA. *See, e.g., Lupino v. United States*, 268 F.2d at 801 (FFA violation "is complete when the offender crosses the border.").[6] However, the line separating a so-called "non-federal" fugitive and a fugitive subject to federal pursuit under the FFA can be a thin one. Many fugitives will "move" or "travel" on interstate highways as they continue to evade arrest, even if they have not been detected crossing state lines. Under appropriate circumstances, such fugitives may be deemed to be moving in interstate commerce and there may well be a reasonable basis to believe that a violation of the FFA is in progress.

This view is bolstered by Supreme Court and lower federal court opinions that have adopted a flexible construction of the interstate movement element in federal criminal statutes similar to the FFA. In *McElroy v. United States*, 455 U.S. 642,

---

[5] In other contexts, the FBI has even been subjected to potential liability under the Federal Tort Claims Act for failing to take the initiative under 28 U.S.C. § 533 when a developing violation of federal law has been detected. *See Bergman v. United States*, 565 F. Supp. 1353, 1396-1401 (W.D. Mich. 1983). There, the United States was held liable for injuries sustained by civil rights "Freedom Riders" when FBI agents failed to take preventive action to thwart a developing conspiracy to violate civil rights which had been disclosed by an informant.

[6] This view is arguably at variance with the statute's text, which requires only that the fugitive "move[ ] or travel[ ] in interstate or foreign commerce," 18 U.S.C. § 1073 (emphasis added), without stating that a state line must be crossed for a violation to occur. In similar contexts, the Supreme Court has declared that movement in interstate commerce may occur without crossing a state border. *See* cases discussed in note 7 and accompanying text.

653 (1982), for example, the Court observed that "interstate commerce begins well before state lines are crossed." [7] If a fugitive is "in the course" of travel on the highways with an intent to proceed across the border, the mere failure to reach the border should not negate a violation of the statute. *Cf. United States v. Schardar*, 850 F.2d 1457, 1461–62 (11th Cir. 1988) ("Goods have been adjudged to have moved in interstate . . . commerce when they are in the course of such a crossing, even when they have not yet crossed the technical boundaries."); *United States v. Ajlouny*, 629 F.2d at 837.

We therefore conclude that FBI agents have statutory authority to investigate state law fugitives whenever, as part of their evasive course of conduct, they have begun to travel on interstate highways or manifested any other reasonable indication (such as the purchase of a bus or airplane ticket to another state) that they will violate the FFA. Moreover, the FBI's authority to detect and investigate federal crimes under 28 U.S.C. § 533 encompasses the authority to "take whatever steps are necessary to bring criminal charges against the suspect criminals." *Bergman v. United States*, 551 F. Supp. 407, 417 (W.D. Mich. 1982) ("While [section 533] confers investigative powers upon an FBI official, it also confers a prosecutorial duty to follow up any investigation undertaken."). Under 18 U.S.C. § 3052, FBI agents have the authority to make warrantless arrests "for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed *or is committing* such a felony." (Emphasis added). Consequently, the fact that a state fugitive has commenced evasive travel on the highways may sometimes establish that he is "in the course" of interstate flight and therefore provide grounds for federal arrest under the FFA.

## B. *Authority of USMS*

In some instances, there may be no reasonable grounds to believe that a state law fugitive sought by a task force will violate the FFA or any other federal statute (e.g., a fugitive who "goes underground" within the state and gives no indication of resorting to interstate travel). This office has previously opined that FBI agents, as such, have no authority to investigate criminal suspects under state law where there are no federal charges outstanding and no reasonable grounds to believe that a federal offense has been or will be committed. *See* 5 Op. O.L.C. at 49. This raises the question whether, in the context of federal-state task force operations, FBI agents serving as Deputy U.S. Marshals would have additional

---

[7] *Cf. United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980), concerning a violation of the federal law against the transportation of stolen goods in interstate or foreign commerce. The defendant was arrested just before he was able to ship stolen goods from New York to Qatar. The court rejected the argument that no offense had occurred because no international boundary had been crossed, stating: "Congress was not aiming only at stolen goods moving across a technical boundary line, but also wanted to reach shipments in the course of such a crossing." *Id.* at 837.

authority to pursue and/or arrest state fugitives that would otherwise be unavailable to them.

## 1. *28 U.S.C. § 566*

The Marshal Service's authority to investigate fugitive felons is found in 28 U.S.C. § 566(e)(1)(B), which provides: "The United States Marshals Service is authorized to . . . investigate *such fugitive matters, both within and outside the United States, as directed by the Attorney General.*" (emphasis added). Significantly, this authorization was passed in 1988, when Congress was already familiar with five years of USMS participation in FIST programs, wherein USMS personnel repeatedly participated in large numbers of arrests of state law fugitives. Section 566(e)(1)(B) authorizes the Attorney General to "direct" the USMS to investigate fugitive matters to the fullest extent permitted by the Constitution in the exercise of her discretion.[8]

In 1988, the Attorney General issued a "Policy on Fugitive Apprehension in FBI and DEA Cases." After providing that the FBI generally has jurisdiction "in locating fugitives pursuant to the Unlawful Flight Statutes (Title 18, Sections 1073 and 1074)", the Policy stated:

> The above provisions shall not preclude the USMS from providing available information to state and local law enforcement agencies about fugitives being sought by their jurisdictions. The initiation of formal fugitive investigations involving State and local fugitives will be done through the Unlawful Flight process set forth above, *except for special apprehension programs (such as Fugitive Investigative Strike Teams and Warrant Apprehension Narcotics Teams) and other special situations approved by the Associate Attorney General.*

*Id.* at 3 (emphasis added). In this regard, the Attorney General's approval of USMS pursuit and arrest of state law fugitives in FIST and subsequent special apprehension programs is authorized by the "as directed" provision of 28 U.S.C. § 566(e)(1)(B).

Subsequent to 1988, the Attorney General has "directed" the USMS to undertake additional "special apprehension programs." In early 1992, for instance, the Attorney General ordered the USMS to participate in Operation Gunsmoke, a pro-

---

[8] Regulations generally describing the marshals' authority in the fugitive area are included under the "General Functions" provisions of the DOJ regulations. *See* 28 C.F.R. § 0.111(q) (1995). This subsection merely provides that among the activities of the USMS that are subject to the supervision of the USMS Director are: "Exercising the power and authority vested in the Attorney General under 28 U.S.C. 510 to conduct and investigate fugitive matters, domestic and foreign, involving escaped federal prisoners, probation, parole, mandatory release, and bond default violators." This provision does not purport to define the outer limits of USMS fugitive authority, and we do not consider its enumeration of authorized activities to be exclusive.

gram in which U.S. marshals worked with state and local police to apprehend armed fugitives charged or convicted of serious crimes involving violence with weapons. In this operation, the Attorney General again authorized the USMS to investigate, pursue, and arrest fugitives wanted on state as well as federal warrants. Indeed, of the 3,313 Operation Gunsmoke arrests, *2,562* were on state warrants. In 1993, the USMS was directed to participate in Operation Trident, another cooperative federal-state fugitive manhunt focusing on the identification and arrest of major narcotics and violent crime fugitives. In his memorandum requesting the Attorney General's approval of Operation Trident (which was given), the USMS Director specifically stated that the operation would include the apprehension of "State and local fugitives wanted for homicide and other violent offenses" and "State and local fugitives wanted on firearms violations."[9] Of the 5,788 arrests made by Operation Trident investigators, 4,825 were based on state charges.

These operations confirm that, pursuant to 28 U.S.C. §566(e)(1)(B) and the more general authorities granted by 28 U.S.C. §§503, 509, and 515, the Attorney General has repeatedly authorized the USMS to participate with state and local police in the investigation, pursuit, and arrest of fugitives wanted on state as well as federal charges. FBI agents serving as Deputy U.S. Marshals could also undertake such activities under the same lawful authority.

When investigations duly conducted under §566 reveal ongoing or inchoate violations of the FFA or another federal law, marshals and deputy marshals also have authority to arrest under the provisions of 18 U.S.C. §3053. That section provides (emphasis added):

> United States marshals and their deputies may carry firearms and may make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States *if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.*

This language provides authority for marshals to arrest a state law fugitive if, as discussed in section II.A, above, there are reasonable grounds to believe he is in the process of violating the FFA. When there is no indication of such an ongoing *federal* violation, however, the question arises whether USMS authority to *investigate* state fugitives under §566 may be extended to participation in the *arrest* of such fugitives.

---

[9] Memorandum for the Attorney General, from Henry E. Hudson, Director, USMS, *Re: Proposed National Fugitive Apprehension Operation* at 1–2 (Apr. 1, 1993).

## 2. *Marshal's Authority under 28 U.S.C. § 564*

Another pertinent source of the authority in question here is 28 U.S.C. § 564, which provides:

> United States marshals, deputy marshals and such other officials of the Service as may be designated by the Director, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof.

We do not think that § 564 provides an independent basis for the *initiation* of investigation or pursuit of state law fugitives by marshals or deputy marshals. Rather, it provides that they may employ the full powers of a state sheriff in executing federal law within a state only when they are *already* exercising valid federal authority within that state.

When marshals participate in a task force investigation of state law fugitives pursuant to the Attorney General's direction under 28 U.S.C. § 566, they are "executing the laws of the United States within a State." As stated by the Supreme Court in *In re Neagle*, 135 U.S. 1, 59 (1890), "any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law' within the meaning of [the Supremacy Clause]." Within that context, the marshals may exercise the same law enforcement powers as those of a sheriff in the host state. *See United States v. St. Onge*, 676 F. Supp. 1041, 1043 (D. Mont. 1987); *United States v. Laub Baking Co.*, 283 F. Supp. 217, 221 (N.D. Ohio 1968). That would include the power to arrest a state law fugitive on probable cause. *See United States v. Red Feather*, 392 F. Supp. 916, 919 (D. S.D. 1975) (U.S. marshals exercising federal authority at Wounded Knee uprising had full authority of state sheriff under South Dakota law to "keep and preserve the peace" and to "pursue and apprehend *all* felons.") (emphasis added).

## 3. *Congressional Ratification of Special Apprehension Programs*

Even if (contrary to our conclusion) none of the statutes discussed above provide authority for the pursuit and arrest of fugitives by federal marshals for purely state law violations, the USMS contends that Congress has nonetheless authorized such activities by passing specific appropriations to fund them after they had clearly been brought to the attention of Congress. Various opinions have recognized that, under appropriate circumstances, Congress may "ratify" an agency's exercise of previously unsettled authority by appropriating funds for the continuation of the activity in question where that activity was specifically brought to Congress's attention beforehand. *See Ex Parte Endo*, 323 U.S. 283, 303 n.24

41

(1944); *Brooks v. Dewar*, 313 U.S. 354, 361 (1941); *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 147–48 (1937); *Alabama v. TVA*, 636 F.2d 1061, 1069 (5th Cir. 1981), ("[C]ontinued congressional funding of allegedly improper agency action can be viewed in appropriate circumstances as a ratification of that agency practice."). For an effective ratification, the appropriation must manifest a purpose to approve the particular authority which is claimed. *See Ex Parte Endo*, 323 U.S. at 303 n.24.

Subsequent Supreme Court opinions, however, have sharply curtailed this doctrine's applicability. In *TVA v. Hill*, 437 U.S. 153 (1978), for example, the Court rejected arguments that Congress's continued appropriation of funds to proceed with construction of the Tellico Dam, even after the appropriations committees had been fully apprised of the project's adverse impact on the endangered snail darter, could be viewed as legislative ratification of the project notwithstanding its conflict with the requirements of the Endangered Species Act. The Court held that the rule against repeals by implication trumps the legislative ratification doctrine; stressed that allowing the enactment of substantive law via appropriations measures would violate the Rules of Congress; and rejected the view that the statements and understandings of the congressional appropriations committees can be ascribed to Congress as a whole for purposes of effecting a ratification through appropriations. *Id.* at 190–92. In *Greene v. McElroy*, 360 U.S. 474 (1959), the Court held that congressional ratification of security clearance regulations, adopted by the Secretary of Defense without explicit authorization from Congress or the President, could not be implied from the continued appropriation of funds to finance aspects of the clearance program. The Court stressed that the doctrine of implied ratification is especially unsuitable when the administrative action in question is based on unsettled constitutional authority. *Id.* at 506–07.

More recently, the D.C. Circuit described additional limitations upon the ratification doctrine:

> While appropriations acts are "Acts of Congress" which can substantively change existing law, there is a very strong presumption that they do not [citing *TVA v. Hill*], and that when they do, the change is only intended for one fiscal year. . . . Accordingly, a provision contained in an appropriations bill operates only in the applicable fiscal year unless its language clearly indicates that it is intended to be permanent.

*Building & Constr. Trades Dep't v. Martin*, 961 F.2d 269, 273–74 (D.C. Cir. 1992).[10]

---

[10] *See also EEOC v. CBS, Inc.*, 743 F.2d 969, 974 (2d Cir. 1984), where the court said that "*Chadha*'s strict interpretation of the principles of bicameralism, presentment, and separation of powers reinforces the need for strong evidence of ratification." In rejecting a claimed legislative ratification argument, that court added, "an appropriations

The USMS has cited excerpts from congressional hearings and reports indicating that Congress has repeatedly passed Justice Department appropriations earmarked for the FIST program, even though the participation of USMS personnel in the pursuit and arrest of state law fugitives was repeatedly brought to the attention of the appropriations committees. 1987 Mem., Attachment at 3–6. The Service contends that these materials are adequate to demonstrate legislative ratification of all actions taken in connection with its special apprehension programs under the standards of the foregoing cases. The FBI's submission also acknowledges that Congress was made aware that FIST operations entailed federal apprehension of state fugitives before it passed appropriations funding such operations, but suggests that the record is insufficient to establish a valid legislative ratification.

The cited legislative materials show that the USMS has repeatedly described the nature of its special apprehension programs to the congressional appropriations committees. For example, USMS Director Morris described FIST operations in considerable detail in 1986 hearings before the House Appropriations Subcommittee for Commerce-Justice-State:

> [W]e go in and set up what is a 10-week round up in which we bring in people from out of district, plus dedicate people in the district to work jointly with state and local officers in partnership. They identify their worst fugitive felons, we identify ours. We cross deputize their officers. We make them special deputy U.S. marshals. For 10 weeks *their officers and ours work in the same cars, the same command posts, going out and arresting felons.*
>
> . . . .
>
> . . . I will tell you in all candor that the reason we can make 3,300 arrests in a 10-week period is that local law enforcement has not been funded adequately to deal with this problem.

*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1986: Hearings Before a Subcomm. of the House Comm. on Appropriations,* 99th Cong., pt. 7, at 737 (1985) (emphasis added). Similarly, in testimony in support of the FY 1985 appropriations request, Morris described how USMS agents worked with NYPD officers in the FIST program: *"We would look for local fugitives* and they would look for federal fugitives." *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for 1985: Hearings Before a Subcomm. of the House Comm. on Appropriations,* 98th Cong., pt. 8, at 784 (1984) (emphasis added). That year the Director was also quite explicit in his request for specific Congressional approval for FIST operations: "Our plans are to try to begin one more FIST this year, and if this

---

bill is a particularly unsuitable vehicle for an implied ratification of unauthorized actions funded therein." *Id.* at 975.

appropriation is granted by this committee, we would hope to run two in fiscal year 1985." *Id.* at 785. An appropriation of "$1,000,000 above the budget request for FIST operations" was granted in the FY 1985 appropriations bill. H.R. Conf. Rep. No. 98–952, at 26 (1984).

More recently, Congress appropriated an additional $2.5 million "for [USMS] expenses and equipment related to the apprehension of fugitives." Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102–393, 106 Stat. 1729, 1742 (1992). The 1992 Report of the House Appropriations Committee contained material again demonstrating that committee's awareness and approval of cooperative state-federal law enforcement programs to apprehend "dangerous drug fugitives" and other fugitive felons. As the report states:

> Cooperative law enforcement programs, involving all levels of government, have proven to be the most effective and efficient way to apprehend dangerous drug fugitives. . . . The Committee has recommended $3 million for the United States Marshals Service to enhance the efforts to apprehend and incapacitate criminals wanted for drug related offenses. . . . The Committee expects that the Marshals Service will work closely with state and local law enforcement agencies . . . to conduct this special operation against drug offenders.

H.R. Rep. No. 102–618, at 42 (1992).

As a departure from the norm that legislative action should be textually explicit, the legislative ratification doctrine should be invoked with caution and only on the basis of a convincing showing that Congress actually intended to grant the authority in question. Here, there is ample evidence that the appropriations committees were repeatedly informed that federal officers participated in thousands of arrests based on state law warrants as an integral part of the FIST operations for which specific appropriations were subsequently passed. On the other hand, there is little or no evidence that awareness of this activity extended beyond the appropriations committees. Nor is there evidence that the appropriations committees, let alone Congress as a whole, regarded the FIST appropriations as a permanent authorization for direct federal participation in arrests based solely on state law violations.

As stressed by the Supreme Court in *Greene v. McElroy*, 360 U.S. at 506–07, when the agency action at issue is based on unsettled or controversial legal authority, reliance on the ratification doctrine is particularly questionable. Here, the use of federal officers to arrest persons charged solely with state law violations cannot be viewed as a settled and uncontroversial legal matter. Given these considerations, and the more restrictive interpretation of the ratification doctrine reflected in more recent court opinions, we conclude that it does not provide a reliable

legal basis for federal marshals to participate in the arrest of fugitives wanted on state warrants only.

### 4. *Inherent or Federal Common Law Authority*

The USMS also contends that it has inherent or "federal common law" authority to pursue and arrest state law fugitives even if no federal statute applies in the particular case. We conclude that in circumstances where there is good reason to believe that the pursuit or arrest will prevent the commission of a federal felony (including a violation of the FFA), the USMS does have limited inherent authority to take the necessary preventive measures. In the absence of such circumstances, U.S. marshals would generally lack any inherent or common law authority to pursue or arrest fugitives wanted solely for state law violations.[11] However, as discussed in section II.B.2, *supra*, whenever a marshal or deputy marshal is already executing federal law within a state, he may exercise the powers of a sheriff in that state in carrying out all reasonable aspects of the federal assignment. *See United States v. Laub Baking Co.*, 283 F. Supp. 217, 220–22 (N.D. Ohio 1968).

In 1970, this office opined that Department of Transportation personnel deputized as Special Deputy Marshals had inherent authority to serve as armed air marshals on civil aircraft in order to prevent acts of air piracy prohibited by 49 U.S.C. § 1472(h).[12] The thrust of that opinion was that the United States "has inherent authority to take reasonable and necessary steps to *prevent [federal crimes]*." Air Piracy Op. at 2 (emphasis added); *see id.* at 3 (stating that federal law enforcement personnel have "the inherent authority to protect against violation of federal criminal laws"). We most recently reaffirmed this position in advising the USMS that it had inherent legal authority to provide protective services to abortion clinics and providers, without regard to the applicability of a court order, in order to prevent violations of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248.

The most prominent judicial authority for the claim of inherent federal enforcement authority is *In re Neagle*, 135 U.S. 1 (1890). There, the Court held that, even in the absence of specific legislation, "any duty of the marshal to be derived from the general scope of his duties under the laws of the United States is 'a law' within the meaning of [the Supremacy Clause]." *Id.* at 59. Although Marshal David Neagle's actions in shooting a would-be assassin to protect the life of a Circuit Justice were not specifically authorized by federal statute, the Court

---

[11] Under exigent circumstances, federal officers qualifying as peace officers under state law sometimes have the authority, or even the duty, to intervene in state offenses committed in their presence, particularly when responding to the call of a local law enforcement officer. *See* 5 Op. O.L.C. at 48. We adhere to that interpretation, but it applies only in narrow circumstances that do not encompass the issue posed here.

[12] Memorandum for Wayne B. Colburn, Director, U.S. Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Law Enforcement Authority of Special Deputies Assigned to DOT to Guard Against Air Piracy* (Sept. 30, 1970) ("Air Piracy Op.").

considered them to be within the general scope of his duties. The Court has re-acknowledged and reapplied the "inherent authority" principle in subsequent cases. *See, e.g., In re Debs*, 158 U.S. 564 (1895).

Based on *Neagle* and the principles underlying our Air Piracy opinion, we believe that U.S. marshals have inherent authority to take reasonable and necessary steps to prevent federal crimes.[13] Participation by federal marshals in cooperative federal-state task forces approved by the Attorney General to pursue and apprehend fugitive federal felons would appear to be a reasonable and necessary step to prevent violations of the FFA and other federal statutes. We do not think that such participation is rendered legally invalid, or constitutes an insupportable expansion of federal law enforcement authority, merely because it also entails the pursuit and arrest of state law fugitives as the *quid pro quo* that motivates the participation of state and local police in these operations. State and local governments cannot be expected to participate in these joint operations unless they receive reciprocal assistance in rounding up fugitives wanted under their laws and warrants.

The validity of that aspect of joint task force operations is also fortified by the prospect that many state law fugitives will "move or travel in interstate commerce," and thus violate the FFA, in the course of their evasive activities. In other words, many of the state law fugitives arrested by these joint task forces are also potential violators of the FFA and other federal laws.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[13] We do not base this position on the view that the scope of federal law enforcement jurisdiction may be expanded on the basis of "federal common law." Rather, federal common law only provides authority for taking necessary actions to implement federal authority that *already exists* or for taking emergency action to prevent crimes committed in the presence of the federal officer. This view is codified in 28 U.S.C. § 564 (formerly § 570), which gives U.S. marshals the common law authority of a state sheriff in the respective states, *but only insofar as he is already enforcing federal law within that state in the first place.*